McGUIRE et ux. v. LOUISIANA BAPTIST ENCAMPMENT, Inc., et al.

No. 2149.

Court of Appeal of Louisiana. First Circuit

Dec. 12, 1940.

Rehearing Denied Jan. 14, 1941.

Writ of Error Refused March 3, 1941.

Alfred D. Danziger, of New Orleans, for appellants.

Hunter & Neilson, of Alexandria, and Ellis, Ellis & Barranger, of Covington, for appellees.

DORE, Judge.

Plaintiffs bring this suit against the defendants, the Louisiana Baptist Encampment, Inc., a non-trading corporation, and its president, Rev. G. Kearney Keegan, in solido, to recover damages to the amount of $30,500, for the death of their son, Lawrence Lesley McGuire, who was drowned in Lake Ponchartrain on August 20, 1938, while attending an encampment of defendant corporation.

Plaintiffs allege that the defendant corporation, through its president, was negligent and did not take the proper precautions for the safety of the campers attending the encampment, thus resulting in the death by drowning of their son.

Defendants filed exceptions of no cause or right of action. The lower court sustained their exceptions in so far as Rev. Keegan was concerned and dismissed their suit as against him but overruled the exceptions as to the defendant corporation.

The defendant corporation then answered, denying that it was negligent in any manner, and averred that proper supervision and means of safety for the campers were provided. This defendant further averred, in the alternative, that plaintiff's son was guilty of contributory negligence in that at the time of drowning he was on a boat ride on which he had deliberately gone, even after he had been definitely refused permission by persons in authority to go on such boat rides.

The plaintiffs asked for and obtained a trial by jury, and, after such trial on the merits, a verdict was returned for the defendant corporation, and a judgment was signed by the trial judge dismissing plaintiff's suit. Plaintiffs have appealed from the judgments sustaining the exceptions to Rev. Keegan and on the merits in favor of the defendant corporation.

The plaintiffs contend that their decision to send their children to the encampment was based upon the representations as set out by defendant corporation, its president, Rev. Keegan, and by Rev. Scharfenstein. their local pastor, both orally and by means of pamphlets They allege that defendants were guilty of negligence in failing to provide adequate measures for the safety of their minor son and that this negligence was the proximate cause of the death of their son. The acts of omission and commission and the gross negligence charged in the petition consist of the following: "(a) In failing to have a lifeguard on duty when the children went in swimming. (b) In permitting the encampment grounds to be without proper supervision. (c) In permitting the son of petitioners to use or make it possible for him to use a skiff without proper supervision. (d) In not providing a roped-off area or safety zone for swimming. (e) In not having the grounds of the encampment patrolled to keep children from going out without permission. (f) In failing to avail themselves of the knowledge that a skiff was on the grounds and use the necessary precaution to keep the children and particularly petitioners' son from using same. (g) In representing that the water was shallow, as above set forth."

In support of the exception filed on behalf of Rev. Keegan, this defendant claims that an officer of a corporation is not responsible for torts of the corporation unless that officer is guilty of malfeasance. They claim that he is never personally liable where he is guilty of only acts of nonfeasance or omission. They claim that he is not even guilty of acts of nonfeasance, much less malfeasance.

Plaintiffs and defendants have treated the exceptions and the merits together in their discussion and we shall do likewise.

The McGuire boy, a little over 15 years old, was drowned when he and another boy, Jack Stark, took four young girls out on the lake in a skiff for a boat ride. Rev. Keegan, the day before the drowning of young McGuire, had given permission to one Calvin Bains to obtain a boat for the purpose of taking pictures of the encampment. Calvin Bains was accompanied by Jack Stark and Bobby Bains in obtaining the boat at Mandeville; after the boat was obtained, it was anchored, hidden from view of the campers, in a little bayou or cove some 50 to 150 feet from the entrance to the encampment grounds.

Early in the morning of the day of the drowning, before breakfast was served, Jack Stark and young McGuire, without securing permission from the encampment authorities, took this boat and went out on the lake for a boat ride and returned and anchored the boat in the same place. After their breakfast, they sought permission in the mid-forenoon to take out two girls for a ride in the boat. They asked permission of two or three persons and were refused; there is a conflict on this point as one of the girls testified that they did have permission to make this second trip from a third person who was asked, Mrs. Santo. However, Mrs. Santo denies that any such permission was granted by her and she is supported in her denial by at least two other witnesses. In any event, whether or not the party got permission to take this boat ride in the morning is of no great importance as nothing happened to the young people on that trip and they returned safely and again anchored the boat in the same place. The only purpose we can see that plaintiff had in showing that this trip was made with the

permission of someone in authority in the encampment was to show the lack of precautions taken for the safety of these young people and probably to show that these two boys, Stark and McGuire, either got permission or assumed that there would be no objection to their taking a third trip in the boat in the afternoon.

In the afternoon of the same day, shortly after two o'clock, young Stark and McGuire got up a party of three or four girls, including McGuire's sister, some two or three years younger than he, and these five or six young people, ranging in age from twelve or thirteen years to sixteen or seventeen years of age, without getting permission from anyone, went out of the encampment enclosure by stepping over or going through a wire fence not far from the place where the boat was anchored and got in the boat and went out on the lake for a ride. Young Stark and McGuire had on their bathing suits under their other clothes. While Stark could swim fairly well, young McGuire could swim very little.

After getting out into the lake, these two boys pulled off their top ·clothing and got into the water close around the skiff two or three times. When the boat was out some distance from the shore—estimated from a quarter of a mile to more than a mile—the boys again got in the water which at that point was several feet deep. In some manner, young McGuire got too far away from the boat and could not hold onto the boat, was unable to swim back to the boat and was drowned. The body was not discovered until two or three days later.

There were from 500 to 700 campers attending the encampment, but on the day of the. accident most of these' had gone to New Orleans on a sight-seeing trip, leaving 150 or so at the encampment. The day was known as a "Free Day" because there were no classes and the regular program was not carried out. The encampment is conducted for training and recreation among those of the Baptist faith who attend. The attendance is secured by articles printed in the Baptist paper, by pamphlets printed by the Booster's Club, and by announcements by the pastors from the various church pulpits. One of these pamphlets gotten out by the Booster's ·Club, of which the officers of the encampment had full knowledge and in which they assented, stated that there was no mixed bathing allowed and that persons were only to swim at specified hours when a lifeguard was on duty in the water; that the water was shallow and chaperons were on duty to advise and co-operate with the campers.

The ground on which the parents seek to hold the encampment and its president, Rev. Keegan, liable for the death of their minor son is that they failed to take the precautions and safeguards for the protection of their son as these parents were led to believe would be taken by. these pamphlets and other representations made to them by the pastor of their church in inducing them to send their children to the encampment. The exception 'as to Rev. Keegan was sustained on the ground that the petition does not allege any acts of malfeasance or misfeasance on the part of the Rev. Keegan, or that he committed any wrong or actively participated in any negligence; that all he is charged with is nonfeasance or the omission of certain duties.

As a general rule, an officer of a corporation is not liable for the torts of the corporation unless he had participated in the wrong or directed and authorized the commission of the act that caused the injury or · damage. See 19 C.J.S., Corporations, p. 271, §§ 845 and 846; Wirth v. Albert et al., 174 La. 373, 141 So. 1; Lee v. Griffith, La. App., 140 So. 142.

It is contended by counsel for plaintiffs that the above rule does not apply in this case for the reason that Rev. Keegan not only owed a duty to the encampment to see that the campers were properly supervised and protected from dangers but that he owed this duty directly to the plaintiffs as well. But it must be remembered that plaintiffs did not entrust their minor son to Rev. Keegan as an individual;. they entrusted him to the encampment of which Rev. Keegan happened to be the president. All of his acts were done in connection with his official position in the encampment. The dues were collected by the encampment, the property was owned by the encampment and the entire affairs were run in the name of the encampment and in its interest. Nowhere in the petition is Rev. Keegan charged with any misfeasance or malfeasance. If it be said that the permission granted by Rev. Keegan to Calvin Bains to secure this skiff which was subsequently secreted and used by Stark and young McGuire on the fateful boat ride was an act of commission on the part of Rev. Keegan, this act in itself had no direct relations to the drowning of the boy. The exception of no cause or right of action was properly sustained as to Rev. Keegan.

■ The next question to consider is whether or not there is shown any negligence on the part of the encampment, its officers and agents, which caused or contributed to the drowning of young McGuire.

A minor remains under the authority of his parents until his majority, but a part of this authority may be delegated to others by the parents for the education and training of their children. C.C., art. 220. It is the contention of the parents in this case that they entrusted their minor son to the encampment on the representations of those who had the control and management of it that the child would be given the same kind of discipline and be subjected to the kind of regulation and protection that a parent would give a child under like circumstances.

We are unable to find where the encampment failed to do anything for the safety and protection of the young people who attended the encampment that it had promised would be done, or that it could have been expected to do. The young people were given instructions regarding the rules as to when they could go in swimming, under what conditions they could leave the grounds and other regulations respecting their camp activities. There were lifeguards—two for the boys and two for the girls—and stakes were placed in the water indicating safety zones. Chaperons, advisers and hostesses were provided, and it is evident that young McGuire and the other young people in the party knew of the regulations as they attempted to get permission from at least three persons in authority on the grounds to make one of these trips and were refused.

Of course, the encampment was under an obligation to provide reasonable regulations and protection for those who attended and who paid a fee to the encampment for its support. Practically all of these who attended were of the age of discretion and were under a certain duty to look out for their own safety. The situation is not similar to that in the case of Rome v. London & Lancashire Ind. Co., La.App., 169 So. 132, cited and largely relied on by the plaintiffs. In that case the boy who was drowned in the pool was only 10 years old, and it was shown that the lifeguards who were supposed to be on duty were not on duty when the child was drowned. In this case, even assuming that there was no guard on duty when young McGuire was drowned, such a fact could have no causal connection with the drowning. It is not even contended that the encampment should have had a lifeguard out in the lake a mile or so from shore where this young man was drowned. All of the lifeguards available on shore could not have prevented the drowning.

If there was any negligence on the part of the encampment it must have been in a failure to take the necessary precautions to keep young McGuire from leaving the grounds and going out in the boat. Certainly, the fact that Rev. Keegan permitted Calvin Bains to secure the skiff for the purpose of taking pictures of the encampment was not negligence, and if it was, as already stated, such negligence had no direct or causal connection with the drowning. It could hardly be said that the owner of an automobile or boat who leaves it where a fifteen year old boy could take it out on the road or on the water and kill himself in an accident would be liable for the boy's death.

There was no duty on the managers of the encampment to patrol the grounds or to place guards around to see that no one left without permission. The proximate cause of the accident was the voluntary act of young McGuire in going out in the boat in deep water and risking his life when he knew that he could swim very little.

■ If there was any negligence on the part of the encampment, it is clear that such negligence was not the proximate cause of the accident. Assuming that no precautions whatever were taken to prevent these young people from going out in this deep water in this boat, young McGuire was guilty of such contributory negligence in going into the deep water at an unsafe distance from the boat as to preclude his recovery. And there is certainly no evidence to show that any of those in charge of the encampment knew, or had any reason to know, that young McGuire intended to go into this deep water and expose himself to those dangers when he knew that he could swim very little.

We find that the judgments rendered in this case are correct, and they are therefore affirmed.