71 So.2d 377 (1954)
SIMMONS
v.
SORENSON.
No. 3921.
Court of Appeal of Louisiana, First Circuit.
March 22, 1954.
*378 Talley & Anthony, Bogalusa, for plaintiff-appellant.
C. Ellis Ott, Bogalusa, for defendant-appellant.
ELLIS, Judge.
Plaintiff has filed this suit as the result of an automobile accident on December 30, 1952 at approximately 5:30 a. m. on Louisiana Highway 58 which runs between Bogalusa and Slidell. Plaintiff was alone in his truck traveling toward Slidell on the inside of a curve in the road, and the defendant's minor son was approaching from the opposite direction coming around the outside of the curve. The latter was accompanied by two young men and the four were the only actual witnesses to the accident.
The Judge of the lower court held that the versions of the accident as testified to by the witnesses was in great conflict and he was unable from the testimony to render a judgment either in favor of plaintiff or the defendant on his reconventional demand. In other words, neither had satisfied him to a legal certainty, and he further held that since the defendant's minor son was a member of the armed forces and home on furlough the defendant was relieved from liability on that ground.
Judgment was accordingly rendered rejecting plaintiff's suit on the main demand, and rejecting the reconventional demand of the defendant, from which judgment both plaintiff and defendant have appealed.
It is shown that the defendant's son was a member of the armed forces, having enlisted with the signed consent of his parents, and at the time of the accident was home on furlough. The night before he had borrowed the defendant's automobile, picked up two friends who were also members of the armed forces, had gone to Bogalusa about 7:00 p. m. to various restaurants, and later on had gone to a night club south of Bogalusa, had visited there for several hours, then on to Slidell to the White Kitchen, a restaurant and bar. They had left the White Kitchen in the early morning hours on the date of the accident headed toward New Orleans, had car trouble and decided to return to Bogalusa, and it was on their way back between 5:00 and 6:00 a. m. that they met the plaintiff in this curve and the collision resulted.
*379 While there is a charge of intoxication, and it might seem strange that these young men stayed out all night visiting restaurants and bars, the only proof of the extent of their drinking is that the plaintiff's son, the driver of the car, consumed four beers. It is plaintiff's positive testimony that he saw the young men after the accident throwing a paper bag out of the car which was later picked up by him and given to the highway officer, and it contained cans of beer. There was testimony that beer cans, without any number being given, were raked or thrown out of the car near the car, by the boys after the wreck. On the other hand, there was a witness who came along immediately after the accident and he did not testify that anyone was intoxicated. The police officer could not testify to that effect. It is true he did not get there until several hours after the accident occurred. From the testimony, the fact must be accepted that the young man was not intoxicated.
Plaintiff testified that as he rounded the curve on his side of the center line he saw the defendant's car approaching but being driven across the center line in his lane of traffic, as he expressed it, "cutting the curve," and that he pulled as far over to the right as possible and that as the black top was very slick and wet from rain the operator of defendant's car, when he saw he was going to strike plaintiff's truck, apparently applied his brakes and skidded, causing the rear part of defendant's car to strike the left front fender, wheel, and "knock the whole side crooked, bent the suspension back, the fender and running board off the whole side."
After the accident the plaintiff's truck went off on its own right side of the road, while the defendant's car went approximately 20 or 25 feet and came to rest on the left hand or plaintiff's side of the road at about a 45 degree angle.
The plaintiff offered as a witness the highway patrolman who testified he was called to this accident at approximately 5:30 a. m.; it was raining hard and the black topped road was slippery; that when he arrived there he talked to defendant's son as well as plaintiff, and that the latter had given him the same version of the accident as stated above. In reply to a query as to what the defendant's son had to say as to how the accident occurred he answered:
"A. He said he was coming around the bend, it was raining and he kind of took a little more of the road to himself, he stated he was across the center at the time, and he hit this car, that both cars sideswiped each other, and the Sorenson car went about 50 feet, at about a 25 degree angle south.
"Q. The Sorenson boy admitted to you being on the wrong side of the road? A. He did."
However, in another portion of his testimony he stated:
"Q. What did the Sorenson boy tell you caused his vehicle to get out of control? A. He told me he was coming around the bend, and the road was wet and slick.
"Q. Did he state to you he slipped over onto the wrong side of the road? A. No, sir he did not, but he said the truck was over the line.
"Q. Did you see any skid marks? A. Yes, sir, prints like a car makes on a blacktopped road like that when it is wet.
"Q. Could you see skid marks on the wrong side of the highway that the Sorenson car made? A. About eighteen inches over the line, yes sir."
We cannot understand that portion of his testimony in which he states that the defendant's son said that he had not slipped over on the wrong side of the road but he said the truck was "over the line." We do not know what he means by the quoted portion of his testimony, unless it be that the truck was over the center line, which would be in conflict with the balance of his testimony.
The defendant's son testified that he was coming around the outside of the curve *380 "and it just seemed to me like this man's truck didn't make the curve, he seemed to come straight on when he rounded the curve." He is corroborated in this testimony by one of his guests, the other being unavailable. The left back door, fender and left rear wheel of defendant's car were damaged. There is no testimony as to any debris, glass or other parts of either vehicle being found on the highway.
In addition to the insufficiency of proof, defendant also contends that he could not be held liable for the acts of his 19 year old son as he was at the time in military service and not under parental control.
Article 2318 of the LSA-Civil Code states: "The father, or after his decease, the mother, are responsible for the damage occasioned by their minor or unemancipated children, residing with them, or placed by them under the care of other persons, reserving to them recourse against those persons. The same responsibility attaches to the tutors of minors." Thus, if the minor does not reside with his parents, they are not liable for his acts. It was shown that the defendant's son had been in the Military Service for approximately two years at the time of the accident.
In the case of Coats v. Roberts, 35 La. Ann. 891, in discussing the liability of parents for the acts of their minor children, the Court said:
"Paternal responsibility is the consequence and offspring of the paternal authority. Whenever the law terminates or interrupts the latter, the former is, at the same time, terminated or interrupted.
"In France, the minor above the age of eighteen years is permitted voluntarily to enroll in the army against the will of his parents. 2 Toullier, No. 1048.
"With us he is after the same age, subject to militia duty. Acts of 1878, p. 268.
"Would it be claimed that the parental responsibility would continue while the minor was thus engaged in military service, and subject to an authority entirely exclusive of his own?
"The fact that, in the case at bar, the suspension of the paternal authority did not last long enough to disturb the residence of the minor with his father, cannot affect the case. Such residence is only important in the eye of the law, as affording the opportunity of exercising the paternal authority and while such authority is lawfully suspended it is of no more consequence than would be the like residence of an emancipated or major child. In this case, it is apparent that the law took the minor from the control and authority of the parent, and placed him under the exclusive control of its officer and in a situation which exposed him to the risk of committing the fault which happened. Why should the father be held responsible? We are not called upon to solve the problem propounded by plaintiff's counsel as to who is responsible for the damage occasioned by this unlawful act. Our duty is discharged when we decide the issue presented in this case. Nor do the objectionable consequences anticipated by him flow logically from our decision, which merely holds that when the law ex proprio vigore, destroys or suspends the paternal authority over the minor, it, at the same time, destroys or suspends the paternal responsibility."
Also in the case of Toca v. Rojas, 152 La. 317, 93 So. 108, 111, the Court on rehearing said:
"Of course the parental authority may be suspended and interrupted, and even taken away altogether by the force and effect of the law. As, for instance, when the state, in the exercise of its sovereign right and power, takes the child away from the parents for the betterment of its condition; when by judgment of court the child is given over into the custody and care of another; where the minor is called into the service of his state or his country, *381 or is summoned into a posse comitatus. In all such instances, the paternal authority is interrupted or terminated, and likewise the paternal responsibility." (Emphasis added.)
We find no manifest error in the judgment of the lower court and it is hereby affirmed.