SUMMERS, Justice.
This is an action in tort for the wrongful death of Charles Edward Williams, a fifteen-year-old boy who drowned while swimming in a public pool. The action is brought by James B. Williams and Olevia Williams, the surviving father and mother, against East Baton Rouge Parish Recreation and Park Commission, owners and operators of the pool, and against Charles A. Green, father of the minor Jaural Leopold Green, one of the lifeguards on duty at the time of the drowning. The action has been dismissed against the City of Baton Rouge and other parties who were initially made defendants.
In the trial court there was judgment in solido against Charles A. Green and East Baton Rouge Parish Recreation and Park Commission, condemning them to pay $2,-500 as damage to each plaintiff. On appeal to the First Circuit, the award to each plaintiff was increased to $10,000. We granted certiorari upon applications filed by defendants.
*775 At approximately 1 p. m. on June 13, 1963 the deceased Charles Edward Williams, age 15, and a friend Michael Yates, age 14, arrived at the Brooks Park Swimming Pool, operated by the East Baton 'Rouge Parish Recreation and Park Commission. Charles could not swim and Michael was a poor swimmer at best.
They paid the admission charge of 25 cents, dressed in swim suits and entered the shallow end of the pool. After playing there for a few minutes they went to the deep end of the pool where another boy tried to teach Charles how to float. Five or ten minutes later they returned to the shallow water and resumed play there, having water fights and “horsing around”.
Charles and Michael then returned to the other end of the pool which was nine feet deep. Their activity there consisted of jumping in, going down and touching the bottom with their feet and kicking up, at the same time holding onto a nearby ladder for safety and to help them reach the surface. Each of them did this five or six times. According to Michael, Charles apparently “kept coming up all right, but the seventh time he didn’t.” As Michael surfaced, he saw Charles standing on the bottom of the pool trying to walk toward the shallow end. Alarmed at this sight, Michael told several people sitting nearby “there was a boy drowning at the bottom of the pool.” Apparently these people thought Michael was joking and they did nothing, whereupon he ran around the edge of the pool to summon the lifeguard, Jaural Green, who was sitting on a raised observation platform on the opposite side. Michael told Green there was a boy drowning at the bottom of the pool. According to Michael’s testimony, Green “just looked down at me as if I was crazy, he didn’t seem to believe me; he thought I was pulling a prank.”
Realizing Green would not respond to his plea for help, Michael ran to the dressing rooms and told the “ticket woman” who was on the phone at the time. She either didn’t believe him or didn’t understand him, for she continued her telephone conversation and said nothing to Michael. So Michael ran back to the pool where Charles had gone down and dived in to confirm his belief that Charles was in danger. Charles was then lying on the bottom.
Hurrying out of the pool, Michael again told those nearby “there was a boy lying on the bottom of the pool.” Because the water was unclear, impairing visibility, he tried to persuade one of them to go down and check, but was refused. Michael then went to the lifeguard a second time, but his plea for help was again ignored. He therefore ran back to the dressing rooms once more and shouted for help again. When he saw that the ticket woman was still on the phone, he ran back to the pool and dived in. Charles was still on the bot *777 tom, and, being unable to rescue him because he could not swim well enough, Michael surfaced again.
At this time Elvin Dalcourt, manager of the pool, having overheard Michael’s plea for help on his last trip to the dressing rooms, ran from the dressing rooms to the pool, dived in and brought Charles’ body to the surface.
Artificial respiration was administered and the Baton Rouge Fire Department was summoned. All efforts to revive Charles were unsuccessful. Fifteen or twenty minutes after the removal of Charles’ body from the pool, the Assistant Coroner of East Baton Rouge Parish arrived and pronounced him dead from drowning.
Defendants assert that the parents of the deceased cannot recover because their son Charles was guilty of contributory negligence. They cite McGuire v. Louisiana Baptist Encampment, 199 So. 192 (La. App.1941) to support their argument that a fifteen-year-old boy who goes into deep water knowing that he cannot swim is guilty of contributory negligence.
■ The facts of the McGuire Case are entirely different from the facts in the case at bar. In the McGuire Case a fifteen-year-old boy took a skiff without the knowledge or permission of the authorities at a summer camp he was attending and, with other companions, rowed out into Lake Pontchartrain. While swimming almost a mile from shore the boy drowned. In that case it was shown that the boy had been told by the camp authorities that swimming would only be permitted in a roped-off area, during prescribed hours and under supervision of lifeguards. The McGuire decision is, therefore, not persuasive here.
In tort suits each case must, as a rule, be judged upon its own peculiar facts and circumstances. Nature does not always impart the same maturity and strength of judgment at the same age, and we are not, therefore, prepared to say that in every instance, under all circumstances, a child of fifteen is capable of legal fault.
We do know, however, that the deceased Charles Williams was possessed of normal intelligence, reason and physical capability, and we are prepared to hold, under the circumstances, that he was aware of the danger and he exposed himself unduly to the risk involved by venturing into the deep water of the pool knowing he could not swim. Charles was, therefore, guilty of contributory negligence.
Ordinarily contributory negligence would bar plaintiffs’ recovery. But the last clear chance doctrine has been approved in this state and this humanitarian rule of law, where applicable, forms an exception to the dogmatic approach which denies recovery on account of contributory negligence. Jackson v. Cook, 189 La. 860, *779 181 So. 195 (1938) ; Rottman v. Beverly, 183 La. 947, 165 So. 153 (1936) ; Hillyer, Comparative Negligence in Louisiana, 11 Tul.L.Rev. 112 (1936).
Thus it is not true in a strict legal sense that a plaintiff is barred from recovery under any and all circumstances merely because he was guilty of negligence which continued down to the moment of the accident which caused his injury. Where a plaintiff negligently puts himself in a place of danger and his negligence and danger are actually discovered by defendant, then there devolves upon the defendant a duty which intervenes or arises subsequent to the negligent acts of the plaintiff, and that duty is to save the plaintiff from the consequences of his negligent acts if he can.
In the application of this doctrine, it is pertinent and material to ascertain whether the defendant could, after discovering plaintiff’s peril, have averted the accident by the exercise of due diligence. If he could have averted the accident by the exercise of due diligence and failed to do so, his negligence in that respect is considered the proximate cause of the injury and the plaintiff’s negligence the remote cause, and the plaintiff may recover although his negligence continued to the instant of the accident. Jackson v. Cook, supra.
In advancing the argument that the last clear chance doctrine does not apply to the case at bar, defendants assert that plaintiffs have not established a principal element of that doctrine, that is, plaintiffs have not established that defendants could have avoided the drowning by the exercise of due care. Restated, the argument is that when Michael Yates told the lifeguard Green that Charles Williams was on the bottom of the pool, Charles was dead, and nothing Green could do would alter that fact, which is to say, the lifeguard could not have averted the death of Charles Williams.
We do not agree that the record supports a finding that Charles Williams was dead and beyond rescue when Michael Yates first ran to the raised platform where the lifeguard Green was stationed. As we appreciate the record, less than two minutes elapsed from the time Michael first saw Charles struggling on the bottom of the pool until the moment Michael told Green that Charles was drowning. From our study of the record, there was still time for Green to dive into the pool and rescue Charles before he died.
These conclusions are based upon the testimony of the Coroner who was of the opinion that a person will live from two to ten minutes if submerged in water, depending upon the physical constitution of the individual, and Michael Yates’ testimony that it took him only 35 seconds to run from the spot where Charles was drowning to the lifeguard platform. It is reasonable to conclude from this evidence that Green *781 could likewise have reached Charles in 35 seconds and, therefore, Charles would not have been submerged more than two minutes when Green reached him, had Green responded promptly to Michael’s plea. Of course, we realize that some time was consumed from the moment when Michael discovered Charles on the bottom until he climbed out of the pool, tried to alarm others nearby and then decided to go to the lifeguard. But the record shows that this action was fast and two minutes provided time for the entire series of events to occur.
What happened thereafter until Dalcourt recovered the body of Charles Williams consumed much more time, but the first discovery of the perilous condition of Charles Williams was, or should have been, when the lifeguard was first warned. It was at that moment when the opportunity presented itself to extricate Charles from the danger to which he had exposed himself. It was at that time when the lifeguard Green violated his duty to a patron of the pool — a duty to remain alert and aware of any exposure to danger of the young children who had been entrusted into his care.
We retognize the duty of care a lifeguard owes to patrons at a public swimming pool to be more than the standard of care required of ordinary persons. A lifeguard, by training and experience, is expected to be prepared at a moment’s notice to rush to the rescue of those in danger of drowning. His is not an obligation which can be discharged by inattention to the activity in the pool and a lack of the awareness of the serious nature of the responsibility imposed upon the position.
The pool was not crowded on this fateful day and the lifeguard should have heeded the call for help and investigated the claim that a boy was drowning. See Rome v. London & Lancashire Indemnity Company of America, 169 So. 132 (Orl. App.1936). He cannot fail to see and to appreciate a peril which would have been apparent had he looked. Franicevich v. Lirette, 241 La. 466, 129 So.2d 740 (1961); Fontenot v. Freudenstein, 199 So. 677 (La.App.1941).
“The rules or standards of the law of tort * * * represent that conduct below which a man can not act in the community without becoming responsible for resultant damage.” Stone, Tort Doctrine in Louisiana : The Materials for the Decision of a Case, 17 Tul.L.Rev. 159, 160 (1942).
Based upon these conclusions the lifeguard’s negligence was the proximate cause of the death of the minor Charles Williams, and, under principles of respondeat superior, the East Baton Rouge Parish Recreation and Park Commission is solidarity liable with Charles A. Green the lifeguard’s father for the negligence of their employee in the course and scope of his employment.
*783 The father of the minor lifeguard complains that the trial court and the Court of Appeal erred in holding him responsible for the torts of the gainfully employed minor whose employer was, at the same time, vicariously liable for the tortious conduct of the minor. The father argues that the result reached creates a situation in the law where both the parent and the employer have authority, control and responsibility at the same time.
By Article 237 of the Civil Code, in the chapter dealing with paternal authority, it is provided that “Fathers and mothers are answerable for the offenses or quasi-offenses committed by their children, in the cases prescribed under the title: Of Quasi-Contracts, and of Offenses and Quasi-Offenses.” By Article 2318 of the Code it is provided that “The father, or after his decease, the mother, are responsible for the damage occasioned by the minor or unemancipated children, residing with them, or placed by them under the care of other persons, reserving to them recourse against those persons. The same responsibility attaches to the tutors of minors.” See also Johnson v. Butterworth, 180 La. 586, 157 So. 121 (1934).
 We think the liability of the parent under these articles is vicarious and if the child is old enough to be capable of fault and is in fact at fault, the liability of the parent is fixed; provided, of course, the minor is residing with the parent at the time. Toca v. Rojas, 152 La. 317, 93 So. 108 (1922). Cf. 2 Planiol, Traite Elementaire de Droit Civil, Part 1, Nos. 907-910 (11 ed. 1939) (An English Translation by The Louisiana State Law Institute (1959)). There are cases in our jurisprudence where the liability of the parent is said to be suspended when a minor is lawfully summoned to serve in a posse comitatus, Coats v. Roberts, 35 La.Ann. 891 (1883), or in the armed forces, Simmons v. Sorenson, 71 So.2d 377 (La.App. 1954) ; Redd v. Bohannon, 166 So.2d 362 (La.App.1964). The instant case is not one where the authority of the state has superseded the parent’s authority, hence the law will not permit the parent to avoid responsibility for the torts of his minor child.
After judgment was rendered in the trial court on September 14, 1966 the Recreation and Park Commission filed an appeal on September 23, 1966 from the judgment which condemned the Commission in solido with Charles A. Green to pay $2,500 to each parent of the deceased. The minutes of the trial court reflect that this appeal' was “on motion of counsel for defendants”, whereas in fact counsel for Charles A. Green did not join in that m'otion and was unaware of the appeal until sometime later.' We shall treat this as an appeal by the Commission only as the Court of Appeal recognized that it should be. The appeal; entered by the Commission was answered *785 by plaintiffs on October 20, 1966 seeking an increase in the award. Later, on December 19, 1966, the defendant Green entered his own appeal, which was never answered by plaintiffs.
In its per curiam opinion on rehearing disposing of Green’s contention that the Court of Appeal could not increase the award in favor of plaintiffs because plaintiffs had not answered Green’s appeal, the Court of Appeal found that the Commission’s appeal necessarily brought before the court the issue of its solidary liability with the codefendant Green. Accordingly, the court reaffirmed the increase in the award to plaintiffs from $2,500 to $10,000 to each parent making the increases applicable to both defendants.
Green’s position is that since his codefendant, the Commission, failed to appeal against him, and since plaintiff did not answer his appeal, the increase in the award is not applicable to him.
Article 2133 of the Code of Civil Procedure provides:
“An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record, whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him and of which he complains in his answer.”
No one has appealed against defendant Green and no one has answered, the appeal taken by him. Under these circumstances there can be no increase of the award against Green. This result is provided for in Article 2133 in language which is clear and unmistakable.
Cases relied upon by the Court of Appeal to reach a contrary result are inapplicable here. Those decisions (Emmons v. Agricultural Insurance Co., 245 La. 411, 158 So.2d 594 (1963) ; Murry v. Bankers Fire & Marine Insurance Company, 198 So.2d 532 (La.App.1967); Fontenot v. Grain Dealers Mutual Insurance Co., 168 So.2d 478 (La.App.1964) and Vidrine v. Simoneaux, 145 So.2d 400 (La.App.1962)) are predicated upon Civil Code, Article 2103, giving solidary obligors the right of contribution, and upon fact situations in which there was a third party demand against the codefendant, or in which the facts revealed that the appeal of one of the codefendants specifically sought a change in the judgment against the other codefendant and made him appellee on the appeal. None of these conditions have been fulfilled here.
*787 We see no'reason to alter the judgment of the Court of Appeal on quantum, except by limiting the award against the defendant Charles A. Green to the amount he was condemned to pay in the trial court judgment and casting the Commission individually for the increase.
For the reasons assigned there is judgment in the sum of $10,000 in favor of each of the plaintiffs, James B. Williams and Olevia Williams, against the defendants, East Baton Rouge Parish Recreation and Park Commission and Charles A. Green in solido, to the extent of $5,000 and against East Baton Rouge Parish Recreation and Park Commission individually for the balance due said plaintiffs, or the sum of $15,000. As herein amended the judgment of the Court of Appeal is affirmed. Costs to be apportioned between defendants.
HAMITER, J., concurs in the result.