BOLIN, Judge.
Stanley Burks, age 12, drowned during daylight hours in a municipally owned swimming pool in the City of Monroe, Louisiana. Suit was filed by Nola Fay Burks Honeycutt, the natural mother, and by Oliver Page, the alleged natural father of Stanley, against the City claiming the negligence of attendants at the pool in failing to respond quickly to an appeal for help from one of Stanley’s companions was the cause of the tragedy.
*599 The trial judge, for written reasons, dismissed the suit as to the alleged father and gave judgment in favor of the mother for $10,000 against the City. All parties appeal, the mother asking for an increase in the award, Oliver Page seeking to establish paternity and the right to recover damages, and the City seeking reversal of the judgment. We conclude the judgment should be affirmed and shall set forth our reasons.
The issues are:
(1) Was the City, acting through its agents and employees, guilty of negligence which was the proximate cause of the death of Stanley ?
(2) If the answer to the preceding question is in the affirmative, was the 12-year-old boy guilty of contributory negligence which bars those seeking to recover for his alleged wrongful death, and, if not, was either plaintiff guilty of negligence which bars his or her recovery ?
(3) Does the alleged natural father have a cause of action for the death of his illegitimate son ?
(4) If there is liability on the part of the City, what is the proper amount of damages to be awarded?
We shall consider first the issue of the negligence of defendant. Stanley Burks could swim very little, if any. On the day of the drowning he and about ten companions were transported by truck from his home to the pool. Prior to leaving home Stanley had obtained permission from his mother to go swimming. The youngsters, ranging in age from 10 to 14 years, were left at the pool by the truck driver. They immediately checked their clothes, donned their suits and went in the pool. Stanley signed the locker register and he and his friend, Ricky Morris, shared the same locker. They entered the pool at approximately 2:30 p.m. or shortly thereafter.
On the day in question the deep end of the pool was roped off because the water had become murky and almost opaque due to an excess of “Dakelite” which had been accidentally released several days before into the purifying system. The water in the three, four and five foot area was clear and the swimmers, mostly children, had been warned on the loud speaker not to enter the deep part of the pool. There was a rope, clearly visible, separating the four foot area from the deeper part, and the floor or bottom of the pool slanted gradually from five to ten feet in depth. There is some dispute as to whether there is a step-off between the four and five foot areas, but for the purposes of this decision we consider a definitive finding on this subject unnecessary.
There were three lifeguards on duty, Robert Tanzy, Lester Miller and Jimmy Swann. Tanzy, the senior lifeguard, testified he was stationed in a chair near the elevated lifeguard station where Miller was sitting. He would move this chair from place to place according to where the need was most apparent, i.e., where the pool was most crowded or near the diving board when it was open and in use. The rope which separated the shallower from the deeper part of the pool was already in place when the pool opened. Tanzy testified someone yelled that a boy was going under the rope and, since the water was too cloudy for them to see, all three guards dived in and checked the pool by feeling the bottom. They found no one and the guard moved one end of the rope back closer to the shallow area to allow better observation of persons going beyond the warning rope.
After the rope was moved back the guards received two or three more alarms that someone was in the deep water and each time the three guards checked the pool. On the last occasion, prior to going in the pool, Tanzy was advised either by the locker room attendant or by Ricky Morris that Stanley was missing and called *600 for him on the public address system two or three times. When there was no response he ordered all the boys from the pool and personally checked to determine if Stanley was among them. When he was not found the three guards went in for the final check and Miller discovered the body near the drain in the deep section. Tanzy then went in, brought the boy out, and immediately made efforts to resuscitate him with mouth-to-mouth breathing. As soon as oxygen could be obtained the efforts were continued by this method until the ambulance arrived, but resuscitation was not accomplished. When Tanzy was asked if Stanley gave any signs of life the reply was he opened his eyes once and wiggled his fingers but gave no other indication of life.
One of Stanley’s young friends, Reginald Walton, testified he went to the swimming pool with Stanley and saw the latter when he got into the deep end of the pool. He testified Stanley accidentally slipped into the deep water and he observed him flailing his arms around when he came up, and after the second time he went down and did not come up again. He said Robert Welch, another companion, went to tell the lifeguards the boy was drowning and one of them dived in but came back and said he did not see Stanley and “he went about his business.” Reginald stated the guard said they had put him (Stanley) out of the pool so he and his companion “went by that and started swimming again.”.
Robert Welch’s testimony corroborated that of Reginald in all essential details, including the fact that it was he, Robert, who told the lifeguard Stanley was “in trouble”. The guard asked him if he was joking to which he replied “no.” The guard then dived in but stayed only a short time and returned to his position.
Ricky Lee Morris, age 12 at the time of the trial, testified he went to the pool with Stanley and they rented a locker together. When asked how he learned Stanley had drowned he replied that Bubba Welch told him. When Ricky went to the locker room for his clothes, the attendant told him that, since Stanley had signed the register, he would have to bring him before he could get his clothes. Ricky told the locker room attendant Stanley had drowned and the attendant instructed him to go have the lifeguard call for Stanley on the loud speaker, but Stanley failed to show up. He testified the lifeguards then jumped in and one of them brought Stanley out of the water. Ricky had remained in the four-foot water and had not seen Stanley from the time they entered the pool until he was brought out of the pool.
The testimony of both Swann and Miller, the other two lifeguards, was essentially the same as that of Tanzy. However, Miller testified he had twice used the public address system to warn swimmers they should use only the shallow end of the pool because of the murky or cloudy condition of the deeper water. He stated a number of boys had been ejected from the pool that day because they had disobeyed the instructions to stay on the shallow side of the rope; that he and the other guards had been in the pool at least three times, prior to the final search for Stanley, to check out reports of someone being in the deep end.
Miller, who was stationed in the elevated lifeguard chair across the pool from Tanzy and Swann, testified they had been receiving reports a certain boy had been going over in the eight-foot section and when they searched for him and failed to find him they thought maybe they were joking.
In resolving the question of fault or negligence the general rule is that a municipality, in the operation of a public swimming pool, is not the insurer of the safety of those making use of such facility. However, the jurisprudence has established that a lifeguard at a public pool must exercise a high degree of care. As aptly stated in Williams v. City of Baton Rouge, 252 La. 770, 214 So.2d 138 (1968):
“We recognize the duty of care a lifeguard owes to patrons at a public swim *601 ming- pool to be more than the standard of care required of ordinary persons. A lifeguard, by training and experience, is expected to be prepared at a moment’s notice to rush to the rescue of those in danger of drowning. His is not an obligation which can be discharged by inattention to the activity in the pool and a lack of the awareness of the serious nature of the responsibility imposed upon the position.”
Considering the almost opaque condition of the deeper part of the pool and the crowded conditions in the shallow end, we find the evidence supports the conclusion of the trial judge that the response of the lifeguards to the alarm first given was less than diligent. Further, these circumstances created an unusual and extremely hazardous situation involving a greater risk than usual for which the City must assume the consequences.
We likewise agree with the trial judge that the expert medical testimony supports the conclusion that, had Stanley been found immediately after the guards were notified he was drowning, resuscitation efforts would, in all likelihood, have been successful. From these observations we conclude the failure of the lifeguards to observe Stanley thrashing about in the deep area and to make diligent efforts to rescue him constituted negligence which was a proximate cause of the accident. This negligence is imputable to their employer, the City of Monroe.
Having found the City and its employees were negligent we must necessarily consider the question of contributory negligence of Stanley in going into the deep water when he could not swim. On this point the only evidence is the testimony of Reginald Walton that he and Stanley were standing on the edge of the pool about three feet from the rope when Stanley “accidentally slipped” into the eight-foot section of the pool. Absent any evidence to prove Stanley was negligent in going into deep water we find defendant has failed' to prove his contributory negligence so as to bar recovery. Neither do we find any evidence that his mother was negligent in permitting him to go to a public swimming pool where lifeguards were employed to supervise activities. Even if we should be in error in this conclusion, we nevertheless find the lifeguards had the last clear chance to avoid the tragedy. The first discovery of Stanley’s peril was, or should have been, when the lifeguard was first warned. It was at that time when the opportunity presented itself to extricate Stanley from the danger of drowning. The medical testimony was that a person might be revived even after being submerged for as long as eight minutes. All evidence relative to the length of time Stanley was submerged leads to the conclusion the time was at least 30 minutes, and probably longer. We find the plaintiff, Nola Fay Burks Honeycutt, is entitled to recover damages for the death of her son.
Considering next the question of Oliver Page’s right to recover as the alleged natural father of Stanley, we agree with the holding of the trial judge that the evidence of paternity falls far short of that necessary to prove Page was the father of Stanley. Page was married to another woman from whom he was not divorced and by whom he had two children, now grown. He apparently separated from his wife in 1945, but was never divorced, and has seen neither her nor his children since. He contends that he and Nola Fay lived together “off and on” from 1954, although he has resided at another address for a large part of that time when he was not in jail. Page’s police record was introduced into evidence and shows he was arrested and jailed on numerous occasions from 1947 until the present. While he claims to be the father of Stanley as well as four or five other children born to Nola Fay, there is no evidence to corroborate this contention other than the statement of Nola Fay, Page and one neighbor who testified he thought Page was the boy’s father. It is urged on behalf of Page that the holding *602 in Glona v. American Guarantee & Liability Insurance Company, 391 U.S. 73, 88 S.Ct. 1515, 20 L.Ed.2d 441 (1968), applies equally to the natural father as to the natural mother of an illegitimate.
Glona stands for the proposition that where plaintiff is “plainly” the mother of an illegitimate child, the fact of its illegitimacy is no bar to her recovery for the wrongful death of her child. Even if we should agree with plaintiff Page’s argument, which we do not, the evidence in the instant case fails to convince us that Oliver Page is “plainly” the father of Stanley.
It is also argued that if the child was indeed the child of Oliver Page “in the bio-logical and in the spiritual sense, and if the court finds that Oliver Page loved, cared for, supported and educated the deceased child, he has suffered a wrong which is compensable in damages under Article 2315”, citing Levy v. Louisiana, 391 U.S. 68, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968).
Having found the evidence insufficient to prove Page was the “biological” father of Stanley, we conclude the cited case is inapplicable to the present facts, which finding precludes the necessity of passing on his negligence. Furthermore, Levy was a suit by the illegitimate child to recover for the wrongful death of the natural mother, and the language employed in the preceding paragraph is used in the United States Supreme Court opinion to describe the nature of the wrong inflicted upon the child.
Last for consideration is the award of $10,000 to the mother for the loss of her 12-year-old son. After careful consideration of the record we find the award does not constitute an abuse of the much discretion vested in the court. La.C.C. Art. 1934(3).
For the reasons assigned, the judgment of the lower court is affirmed. The City of Monroe is assessed with whatever costs that may be legally imposed under La.R.S. 13:4521.