I,WILLIAM H. BYRNES III, Chief Judge.
STATEMENT OF THE CASE
On 11 August 2000, Bruce Elsensohn sued Farrington Productions, Inc. and its local representative, Robert Beal, alleging breach of contract. Mr. Elsensohn contended that on or about 12 August 1999 he and Farmington entered into a written *612 employment contract for a term of one year commencing 28 October 1999 and ending 27 October 2000 providing for compensation of $1,000 per six-day week with an additional $100 per week for serving as a band leader.
Mr. Elsensohn contends that Mr. Beal libeled, slandered and defamed his reputation and tortiously interfered with Mr. El-sensohn’s contractual rights. Furthermore, Mr. Elsensohn claims that Mr. Beal interfered with his right to obtain other employment contracts by his defamatory actions. During the course of trial, counsel for Mr. Elsensohn stated that he made no claim for constructive discharge.
Farmington and Mr. Beal answered and reconvened, alleging Mr. Elsensohn breached the contract in question by having failed to perform, having provoked an altercation with Mr. Beal in the presence of witnesses and having declared that he | ¡.would no longer work for Farmington, thereby unilaterally terminating the contract in question. Farmington and Mr. Beal contend that this breach of contract was made with the intention of causing harm to Farmington and was, therefore, a bad faith breach of contract. Farmington claims damages for costs it suffered in having to obtain a replacement for Mr. Elsensohn and for attorneys’ fees incurred in this action. Farmington and Mr. Beal did not offer evidence at trial to support their counterclaim for damages and attorneys’ fees.
The case was tried to the trial court which, on 26 March 2002, rendered judgment in favor of Mr. Elsensohn in the amount of $24,200 on the breach of contract claim, and in favor of Farmington and Mr. Beal dismissing Mr. Elsensohn’s various defamation claims. From this judgment Farmington and Mr. Beal appeal. Mr. Elsensohn has not answered the appeal, from which we infer that he has abandoned his defamation claims.[1]
We reverse the judgment of the trial court insofar as it casts defendants/appellants for damages caused by alleged breach of contract.
| ¡¡STATEMENT OF FACTS
In its reasons for judgment the trial court found that Mr. Elsensohn entered into a one-year employment contract as a musician with Farmington, commencing 28 October 1999 and ending 27 October 2000 at the rate of $1000 per week with an additional $100 for leading the band.
The trial court found that working conditions were often difficult, causing Mr. Elsensohn’s and Mr. Beal’s working relationship to become strained. The trial judge did not find that this strain was *613 caused by the fault of either party to the contract or by Mr. Beal.
The court found that Farmington violated the employment contract when Mr. Beal discharged Mr. Elsensohn for misconduct, effective 23 June 2000.
The trial court found no substantial evidence to support Mr. Elsensohn’s defamation claims.
Mr. Elsensohn, a local pianist and piano tuner, testified that, in response to a print media advertisement, he auditioned to perform in a show Farmington produced to Harrah’s Casino. The show involved a mini-parade that included a float on which Mr. Elsensohn performed on keyboard. After having been accepted, he met with Farmington in Las Vegas, Nevada, to put the music for the show down on tracks, record the songs and confer with Farring-ton as to which songs would be chosen and how they would be recorded. The show was to be a daily mock Carnival parade, with a float, marching band, dancers and stilt walkers. |4 The parties stipulated to the contract as described by the trial court in its reasons for judgment.
Mr. Elsensohn testified that Mr. Beal was his immediate supervisor. Mr. Elsen-sohn’s duties included creation of a New Orleans music track, help in putting together instrumentalists and rehearsals of the musicians. Mr. Elsensohn was allowed to perform work that was not within the terms of the contract for other employers while at Harrah’s, and was additionally compensated for that work, which included tuning instruments, making repairs and otherwise performing outside of his work for Farrington.
According to Mr. Elsensohn, he felt that he was “getting engineered out” of his position at Harrah’s at about the same time that a new singer, Cory, was brought in. Subsequently, Mr. Elsensohn testified he was “kind of emasculated from doing anything that a music director did.” He testified that his recommendations concerning choices of band members were ignored, and he did not approve of the quality of the newly hired singer and saxophone player. Mr. Elsensohn also testified that Mr. Beal was complaining about things Mr. Elsensohn viewed as minor, such as attendance at staff meetings and riding on the float in the casino mini-parade.
Around 23 June 1999, Mr. Elsensohn testified he asked Mr. Beal if he needed a piano player, Mr. Beal stormed off and Mr. Elsensohn went to his car to call the supervisor, Joy Moráis, with whom he testified he had a “personal relationship” to tell her what was happening, but Ms. Moráis was on vacation. An |5unidentified person asked him why he wanted to talk to Ms. Moráis, but he refused to discuss the situation with anyone but her. When Mr. El-sensohn returned to do the show, Mr. Beal met him and said someone from the Far-rington office was on the phone and would like to talk to him. Mr. Elsensohn testified:
“Putting two and two together, I called the office. The office calls him, or he calls them. And at the same time, I called. And I know Joy’s not in town. I don’t want to take that call. I want to talk to you [plaintiff counsel], an attorney, or I want to talk to Moráis. I don’t want to sign anything, nothing.”
[[Image here]]
I told him I didn’t want to make the phone call. And then I don’t remember exactly how — the door was open. And I think the bathroom’s right past me. And I walked past it. And it was like, “Can you come in here a minute?” And I kind of looked in there for a minute. And I said, “Robert, I can’t, I can’t work *614 with you, man. We’re not communicating, you know.” And, you know, he’s like, you know, “Shut up, man.” He says, “I’m trying to give you three days’ administrative leave.” I said, “I really don’t want three days of administrative leave. I wanted to play. That’s all. And I want to wait and talk to Joy.” He says, “Well, you got three days. I need your pass.” I said, “You’re not gonna have any argument from me.”
It was just this little featherweight. And there was this copy machine. I put it down on the copy machine. This is a hollow desk; it made a noise too. I put a little, plastic badge down there. But it was a badge that hung around your neck, which the hanging part of it was mine. And I use it at the Jazz Fest, and I use it at other fests when I play with other known acts that I need a pass for. I even use it sometimes for piano tuning.
After having voluntarily surrendered his pass, one of the security guards came in to escort him from the property. Without that pass, he was unable to get into secure areas in the casino.
|fiMr. Beal testified that Mr. Elsensohn took off his badge, threw it across the room onto the fax machine and said, “You want that? F— that. I don’t need your f-money. I quit. I don’t need this f-job.” Mr. Beal remained seated, and Mr. Elsensohn said, “You have all these witnesses here. You goading son of a bitch. I’m gonna juice you,” and patted a bag he was carrying. Mr. Beal testified that from his experience in Las Vegas he took the “juice” comment as a threat. Mr. Beal memorialized this confrontation by a memorandum dated 23 June 2000. According to the memorandum, Mr. Elsen-sohn did not ask for or fill out a request to perform outside work in the Jazz Court.
Following this confrontation, Mr. Beal wrote a letter dated 23 June 2000 to Har-rah’s Casino CSO (security) department, noting that Mr. Elsensohn was placed on Administrative Leave from Farrington Productions, and his badge was confiscated. According to Mr. Beal’s letter, in the presence of Donald Eckert, the security person present, and Patricia Tieperman of Farrington’s wardrobe department, Mr. Elsensohn threatened to have Mr. Beal “juiced.” Therefore, Mr. Beal was requesting extra security and advising Harrah’s that any incidents with Mr. El-sensohn on Harrah’s premises would be Harrah’s responsibility. Mr. Beal identified the letter during his direct examination.
Mr. Elsensohn testified that some time later he played at Harrah’s, but not on so regular a basis as previously, probably no more than six times. Mr. Elsensohn claims he was essentially “black-listed” by Farrington and Mr. Beal. However, on cross-examination, the defense counsel introduced an e-mail transmission sent from Mr. Beal to Harrah’s, with copies to Ms. Moráis and Mr. Elsensohn, dated 30 June 2000 and providing:
|7Please be advised that Farrington Productions has no problem with Bruce Elsensohn working sessions in Jazz Court or Hideaway Lounge with any artists or musical groups.
Mr. Beal testified that after having received notice from his corporate headquarters that Mr. Elsensohn was no longer a Farrington employee, on 30 June 2000 he wrote to Mr. Whitley, director of security for Harrah’s casino, informing him that as of 26 June 2000 Mr. Elsensohn was no longer a Farrington employee.
Mr. Elsensohn admitted on cross-examination that he did not attempt to go to Harrah’s after 23 June 2000, and that he had no written directive from Farrington or Mr. Beal keeping him out of the casino. *615 In his deposition, Mr. Elsensohn had testified that he was out of business for about a month.
Mr. Elsensohn received payments under his contract with Farrington through 1 July 1999, and was not paid from 1 July 1999 through 31 October 1999. An administrative law review panel found Mr. El-sensohn was entitled to state unemployment compensation, which he has received. Mr. Beal testified that he had no knowledge of the unemployment hearing and did not testify before the administrative judge.
On cross-examination, Mr. Elsensohn admitted that between 23 and 30 June he received several messages from Mr. Beal, but refused to return them. He was shown his own e-mail transmission to Mr. Beal admitting, “I have truly not been available when you’ve called.”
Mr. Elsensohn denied having vandalized property upon his leaving Farrington’s employ.
|sMr. Elsensohn offered certain testimony and evidence allowed by the trial court to address his defamation claims, but which were inadmissible hearsay as to the claim at issue on this appeal.
Mr. Elsensohn testified that the personal relationship he had with Ms. Moráis ended shortly before his alleged termination.
On cross-examination, Mr. Elsensohn admitted he called Mr. Beal a “goading son of a bitch” as he was leaving the office. He also admitted that the administrative judge had found that on 22 June, the day before the alleged termination, Mr. Beal and his assistant, Ms. Embry, presented him with a written warning, alleging he was not performing his duties as instructed after having been warned orally on 11 June 2000 and on 16 June 2000. Mr. Elsensohn contended that he would not sign the written warning without having consulted plaintiff counsel.
Mr. Elsensohn identified a Notice of Corrective/Disciplinary Action dated 10 December 1999 and signed by him showing a complaint by Edward Paris, a band member. According to the acknowledgment signed by Mr. Elsensohn on 11 December 1999, on 10 December at approximately 12:15 a.m. in the men’s dressing room, Paris, who is blind in one eye and has some difficulty making spatial judgments, hung his costume by mistake on Mr. Elsensohn’s hanger. This led to a curt and abrupt response from Mr. Elsen-sohn who said, “You don’t have to go ghetto on me,” a comment perceived as a racial remark by a fellow performer, inappropriate behavior, yelling in the public hallway and in the co-manager’s office. This activity was also observed by casino employees David Poe, Cranston Clements, George Cruz, Mark Braud and Joe Terragano.
| ¡A-ceording to the document signed by Mr. Elsensohn, he agreed to a counseling session and a mandatory apology to be given to the fellow performers who observed the actions. Mr. Beal signed a follow-up report that he came upon the scene in the hallway and took the parties to the office to try to placate the performers and to hear both sides of the story, and spoke to the witnesses. Braud, the leader of the marching band, demanded that Mr. Elsensohn apologize to everyone in the dressing room for his speech and behavior. Mr. Elsensohn did so that evening, and a written counseling session was held in the office between Mr. Beal and Mr. Elsen-sohn. Upon observation for two months, Mr. Beal stated he did not believe Mr. Elsensohn made the statement as an intentional racial remark; however, he did what he was told to do to correct the matter.
Mr. Elsensohn also signed an Employee Acknowledgement of Verbal Note given on *616 16 December 1999, admitting that Farring-ton had warned him (1) against removal of personal stereo equipment from dressing rooms and use of private headsets; (2) to remove offensive photos and/or love notes from mirrors; and (3) to avoid any sexual conversations of any kind, in accordance with his orientation.
Mr. Elsensohn refused to sign a report of correetive/disciplinary action issued 22 June 2000, setting forth a written warning. The document alleges that Mr. Elsensohn failed to work as directed by two verbal directives of 11 and 16 June to ride the parade float at the keyboard. On 20 June he left the float before reaching the Jazz Court and did not ride after Jazz Court 2. The report warns that Mr. Elsensohn must work as directed and any future disregard may lead to termination. According to the witness, A.J. Embry, Mr. Elsensohn refused to sign the document, claiming to be under duress. According to the witness:
[10He also feels that Robert Beal is picking on “his ass.” He was yelling and trembling and claims that the driver left without him. He complained that the current latch on the gate is the reason he cannot get in or out of the float. When reminded that he got out of the float while it was moving on his own directive, he became more irate. He claimed he didn’t think it was a problem for him to get out early. He also said that he must speak to Joy about this incident. When asked to calm down, he said that was his normal attitude when he was being picked on. I also feel that had Robert [Beal] not been here, Bruce [Elsensohn] would have been completely out of control. His violent temper made me feel very threatened.
Mr. Elsensohn also denied a complaint made by Rick Knowles that Mr. Elsensohn found a picture of Knowles’ boyfriend offensive and made disparaging comments about Knowles’ sexual orientation.
Kelly Hackenjos, a/k/a Kellie Karl, testified that she is a dancer, singer and choreographer formerly employed by Farring-ton and Harrah’s casino. She stopped working for Farrington because her costume was painful. According to Ms. Hack-enjos, Mr. Beal was not responsive to her complaints that the costume was ill fitting and caused her discomfort. However, former wardrobe manager Patricia Tieper-man testified that Ms. Hackenjos constantly complained about her costume, although both Ms. Tieperman and the wardrobe mistress she supervised alternatively tried to comply with Ms. Hackenjos’ wishes to no avail. She found no objective evidence of any problem with the costume. Furthermore, she testified that Ms. Hackenjos lied to her concerning her participation in a traveling production company.
Ms. Hackenjos testified that she was required to pay for alterations to the costume when she asked for and was granted an early contractual release. Mr. Beal testified that this was standard procedure. When Farrington granted an early | ncontractual release to an employee, the employee was required to pay for any wardrobe alterations for his or her replacement, including replacement shoes.
Ms. Hackenjos also identified a sexually explicit and offensive e-mail transmission allegedly from Mr. Beal, dated 27 April 2001, ten months after Mr. Elsensohn’s alleged termination. On cross-examination, Ms. Hackenjos admitted that this email was sent after she had eonsensually terminated her employment contract with Farrington, and that she and Mr. Beal exchanged jokes by e-mail during and after her employment with Farrington. Mr. Beal denied having sent the email to Ms. Hackenjos.
*617 Rebecca Barry testified that she is a saxophone player and vocalist who employed Mr. Elsensohn to play with bands on late shift for $100 per performance or “gig”. After Mr. Elsensohn either quit or was terminated, she was unable to hire him to play at Harrah’s. Charlie Brent, who was a go-between for Harrah’s music, told her that Mr. Elsensohn was not allowed to play at Harrah’s. On cross-examination, she could not recall whether Mr. Elsensohn played for her around the 30th of June. Mr. Elsensohn contacted her after June 1999, asking for dates outside of the casino. She testified that at no time did Mr. Elsensohn show her the email from Mr. Beal to Harrah’s that said Far-rington had no problem with Mr. Elsen-sohn working sessions in Jazz Court or Hideaway Lounge with any musical groups. She admitted that she never asked Mr. Brent for permission to use Mr. Elsensohn.
Ernie Cosse, III testified that he worked as a bandleader with his own band in Harrah’s Hideaway Lounge from right after Harrah’s opening in 1999 to 2001. He used Mr. Elsensohn twice before the termination, paying him $100 per performance. Subsequently, he had a brief discussion with Mr. Brent who told him he couldn’t use Mr. Elsensohn any longer.
ImMr. Beal testified on cross-examination that he has performed for thirty years as a professional singer and dancer. He was involved in the preproduction of the Harrah’s casino show while in Las Vegas, and was paid $1,000 weekly. He testified that Mr. Elsensohn was more than adequate as a keyboard artist. He was not up to the position of band director because of several altercations that occurred during the run of the show at Harrah’s. Furthermore, Mr. Elsensohn was not playing the keyboard, not riding the float where the keyboard was located, was leaving the float and was failing to assist the two singers when they asked for assistance. He also failed to resolve the singers’ musical problems. Mr. Beal testified that the majority of Mr. Elsensohn’s playing time was to be spent on the float.
Farrington responded to Mr. Elsen-sohn’s complaint that the float smelled bad by allowing him to install an electric fan to blow fresh air into his face and blow áway the unpleasant smell.
Mr. Beal testified to the dressing room incidents, and incidents with Eddie Bo and Cory Lear. Furthermore, Mr. Elsensohn did not support the singers under his supervision.
Mr. Beal testified that Mr. Elsensohn told him in his office that he quit. Mr. Beal denied having received a copy of the email dated 31 May 2001 from Mr. Brent to Mr. Elsensohn forwarding a message from Jim Boa head of Harrah’s audiovisual department to Mark Conner, Har-rah’s entertainment director, with a copy to Steve Jeandron of customer safety and risk management. The original message from Boa read:
Mark,
|13I have been told by my technicians that one of the musicians informed them that Bruce Ellsinsohn [sic] has been cutting piano strings and purposely messing up the tuning of the Jazz Court Grand Piano. Please do not hire this guy to play here. I am sure he is disgruntled after being let go from the parade show. I have a[sic] invoice for $65.00 for string repair that I will bring you today.
Mr. Beal testified that the email was incorrect in saying that Mr. Elsensohn was “let go”, and reaffirmed that the pianist had quit. He denied having banned Mr. Elsensohn from the casino.
*618 According to Mr. Beal, when Farrington has an issue with an employee, it issues a paid administrative leave in order that the employee might “cool down”, and go over his thoughts concerning why he was sent home on administrative leave. The casino has a rule that bars a person placed on administrative leave from coming back for thirty days, after which they must be escorted by a customer safety officer directly to Harrah’s manager’s office for review. Farrington’s rules mirrored the casino’s regulation in this respect. This coincides with Mr. Elsensohn’s testimony that he missed about a month of work after he left Farrington’s employ.
In Mr. Elsensohn’s case, since the pianist quit after having been placed on administrative leave, Mr. Beal called his corporate vice-president in Las Vegas who said she would review the situation. When Ms. Moráis returned from vacation, she called Mr. Beal and told him Mr. Elsen-sohn would no longer be working with Farrington at Harrah’s in New Orleans. She did not disclose the substance of her conversation with Mr. Elsensohn to Mr. Beal.
Mr. Beal testified that by email he informed Harrah’s security and audiovisual directors, Messrs. Whitley and Boa, that they were free to hire Mr. Elsensohn although he had quit his job with Farring-ton, and supplied a copy of the l14email message. Furthermore, he followed up the memo with a verbal conversation with those gentlemen and with Mr. Brent.
Mr. Beal testified that after Mr. Elsen-sohn quit his job, he saw Mr. Elsensohn a number of times working in the Jazz Court at the keyboard.
Mr. Beal testified that he encouraged his employees to file grievances stating any personnel issues that may have arisen; however, neither Mr. Elsensohn nor any other employee filed a grievance during Mr. Beal’s tenure with Farrington at Har-rah’s casino.
Officer Michael J. Field, a New Orleans Police Department sergeant, testified that he had a detail working at Harrah’s Casino through the NOPD Gaming Division from October 1999 to November 2001. Mr. El-sensohn contacted him and said he was forbidden to go into the casino, and would be arrested for trespass were he to enter the casino. Officer Field said he had no paperwork that would support that conclusion. He was unaware of any charges having been brought against Mr. Elsen-sohn. He testified that he was told about Mr. Beal’s request to Harrah’s safety officers saying Mr. Elsensohn was barred from the casino based on an allegation of criminal damage to the piano; however, he did not produce any written evidence to support this claim. Mr. Beal specifically denied having authored such a letter.
Patricia Smith Tieperman testified that she was employed by Farrington as wardrobe manager from October 1999 to July 2001. She was present on 23 June 2000 at a meeting between Mr. Elsensohn and Mr. Beal at the casino, and at the seven o’clock meeting that preceded it. According to Ms. Tieperman, Mr. Beal told Mr. Elsen-sohn he needed him to come into the office to participate in a telephone call to the company’s office in Las Vegas. Ms. Tiep-erman testified that |1BMr. Elsensohn said he would not go into the office and “worry about that office b— s — ” and that he would not go in there. Subsequently, she came to Mr. Beal’s office, and security officer Donald Eckert was present. Mr. Elsensohn walked in and said, “You want me to leave? I’m leaving. Here, you want this?” Mr. Elsensohn threw his employee badge across the fax machine. Mr. Beal told him he was given three days’ paid administrative leave. According to Ms. Tieperman, Mr. Elsensohn replied with
*619 the F word. “I quit. I won’t work for you anymore, Robert.” And then he said, “Robert, I’m gonna juice you, man. You are a goading son of a bitch.”
Ms. Tieperman testified that she took the “juice” comment to be a threat. Ms. Tieperman then said that this kind of obscenity was “par for the course” for Mr. Elsensohn, and that Mr. Elsensohn used “MF” in normal conversation.
STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a trial court’s or a jury’s finding of fact in the absence of “manifest error” or unless it is “clearly wrong,” and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong. When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact-finder can be aware of the variations in demeanor 11fiand tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or dear wrongness even in a finding purportedly based upon a credibility determination. See, Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989); Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993).
We are instructed that before a fact-finder’s verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State Through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart, supra. Although we accord deference to the fact-finder, we are cognizant of our constitutional duty pursuant to LSA-Const. Art. 5, section 10(B) to review facts, not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court’s verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman’s Fund Ins. Co., 650 So.2d at 745.
Thus, we must inquire as to whether there was sufficient evidence before the trier of fact to support its finding that Farmington and Mr. Beal breached Mr. Elsensohn’s employment contract,
h .ASSIGNMENT OF ERROR: The trial court was manifestly erroneous in holding Farrington and Mr. Beal breached an employment contract with Mr. Elsen-sohn absent evidence that plaintiff was discharged and in light of evidence that Mr. Elsensohn quit his job.
The record contains several statements by counsel during trial that the issue in this case is actual termination, and that Mr. Elsensohn does not claim constructive termination. Therefore, this Court has the duty of determining whether there is evidence of record from which the trier of fact reasonably could determine *620 that Farrington actually terminated Mr. Elsensohn.
The record is clear and unequivocal that at his meeting with Mr. Beal, Mr. Elsen-sohn grew angry and, either with obscenity, as testified to by Mr. Beal and Ms. Tieperman, or without obscenity, as testified by Mr. Elsensohn, threw his badge across the room and did not accept the three-day administrative leave cooling off period offered by Mr. Beal o^ behalf of Farrington.
This action clearly constituted Mr. El-sensohn’s breach of the employment contract in question. Having relinquished his badge and indicated his unwillingness to take advantage of the administrative leave option, he cannot now be heard to claim that Mr. Beal and Farrington terminated him involuntarily. His failure to file a grievance against Mr. Beal or to appeal his alleged termination to Farrington’s corporate office provides the sort of objective evidence that, together with the appellants’ evidence, contradicts the contrary testimonial evidence given by Mr. Elsensohn.
There is simply no evidence that Mr. Elsensohn was blacklisted by Farrington or Mr. Beal. To the contrary, he admitted he received work at Harrah’s [ ^subsequent to his termination. The evidence is clear and uncontroverted that the Harrah’s management, in spite of the email message from Mr. Beal to its security and audiovisual departments advising them that Farrington had no objection to their hiring Elsensohn, chose independently and, presumably, based on their own observation of Mr. Elsensohn, not to hire him at their New Orleans casino.
From the record it is quite clear that even if we were to accept as totally credible all of the evidence offered on Mr. Elsensohn’s behalf, the fact remains that he unilaterally terminated his employment contract by refusing to take advantage of the three day cooling off period, turning in his identification badge, leaving the premises and refusing to return his employer’s telephone calls. Therefore, in the absence of supporting evidence, we find the judgment of the trial court to be manifestly erroneous and clearly wrong insofar as it concludes that Farrington and Mr. Beal breached Farrington’s contract with Mr. Elsensohn by untimely termination.
CONCLUSION AND DECREE
For the foregoing reasons, we reverse the judgment and the trial court and render judgment in favor of defendants/appellants Robert Beal and Farrington productions, Inc. dismissing the petition of Bruce Elsensohn with prejudice at plaintiffs cost.
REVERSED AND RENDERED.

. Appellee’s brief includes in its argument the following: "The trial Court denied Elsen-sohn's claim for defamation. The trial Court erred in this regard. Certainly the publication of a falsehood about Bruce [sic] damaging a piano should be grounds for recovery of damages.” However, the appellee did not file a timely Answer to Appeal as required by LSA-C.Civ.P. art. 2133(A), which provides in pertinent part: "An appellee shall not be obliged to answer the appeal unless he desires to have the judgment modified, revised, or reversed in part or unless he demands damages against the appellant. In such cases, he must file an answer to the appeal, stating the relief demanded, not later than fifteen days after the return day or the lodging of the record whichever is later. The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him in favor of the appellant and of which he complains in his answer.” Matthews v. Consolidatged Companies, Inc., 95-1925 (La.12/8/95), 664 So.2d 1191; U.S. Fid. & Guar. Co. v. Hurley, 96-1421 (La.App. 4 Cir. 8/6/97), 698 So.2d 482; Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Williams v. City of Baton Rouge, 252 La. 770, 214 So.2d 138 (1968); and Britt Builders, Inc. v. Brister, 618 So.2d 899 (La.App. 1st Cir.1993).