HAMITER, Justice.
 

 In this tort action Mrs. Ruth Parker Turner sought to recover damages from the Caddo Parish School Board for personal injuries sustained while she was a spectator at a football game played between Midway and Lalceshore Junior High Schools in Shreveport.
 

 Originally, her suit was dismissed on an exception of no cause of action. On an appeal the judgment was reversed, the exception overruled, and the case remanded for a trial on the merits. Turner v. Caddo Parish School Board, La.App., 179 So.2d 702.
 

 Following such trial, but before judgment, Mrs. Turner died from causes not
 
 *813
 
 related to the injuries received in the accident. Whereupon, the administrator of her estate was substituted as plaintiff. (The defendant has not challenged the right of the administrator to prosecute the demand.)
 

 Thereafter, the district court rendered judgment in favor of the defendant, it dismissing plaintiff’s suit. But that judgment was reversed by the Court of Appeal which awarded to plaintiff the sum of $18,500 as damages. Turner v. Caddo Parish School Board, La.App., 204 So.2d 294.
 

 We granted certiorari on defendant’s application. 251 La. 756, 206 So.2d 98.
 

 The record establishes the hereinafter recited facts.
 

 On October 17, 1963 Mrs. Turner, who was seventy-one years of age and the grandmother of one of the players on the Midway Junior High School football team, attended the game between Midway and Lakeshore Junior High Schools, this at the invitation of another grandson. She was accompanied by the latter, and by her daughter and son-in-law, Mr. and Mrs. Harold Dumas.
 

 The game was one of a regular schedule in a league made up of the seven junior high schools in Caddo Parish. No admission was charged for any of the games; and while parents and other family members, as well as the general public, were permitted and welcomed to attend they were not specially invited or encouraged by the school officials to do so either directly or indirectly. No publicity or advance notice of the games were provided by the schools to any persons other than to the students. Such games, as was the one in question, were played in the afternoons (after school hours) on regulation size, lined football fields, located in the various school yards, they doubling as playground and physical education training areas during the regular school day. At none of the schools were bleachers or other permanent seats afforded.
 

 The Midway-Lakeshore game was played at the Lakeshore school. Various persons in attendance estimated the crowd at from six hundred to one thousand people. No raised, physical barriers separated the playing field from the spectator areas. However, on both sides, at approximately the fifty-yard line, were benches for the use of the respective teams; and white “chalk lines”, marked on the ground with powdered marble (the same material used to delineate and mark the playing field), indicated the restraining lines behind which spectators were supposed to sit or stand.
 

 At midfield (between the forty-yard lines) the spectator, restraining lines paralleled the sidelines of the field some 25 to 30 feet distant therefrom. From the forty-yard line they angled toward the sidelines to points approximately three to nine feet at the end zone lines.
 

 
 *815
 
 Two, perhaps three, of the other junior high schools used a raised rope or chain to designate the spectator zone on the west or “home team” side of the field. The others marked that zone in a manner similar to the one at Lakeshore. All marked the spectator zone on the east, or “visitor’s”, side with a chalk line, as did Lakeshore.
 

 After Mrs. Turner and the members of her family arrived at the school they stationed themselves on the east side to watch the game, they remaining throughout their stay at about the forty-yard line. Other spectators moved up and down the sidelines with the play of the ball.
 

 At some time late in the third quarter, or in the early part of the fourth quarter, a play went out of hounds in the area in which Mrs. Turner was standing. At that time there were spectators in front of her. They moved back to get out of the way of the players who ran into Mrs. Turner, knocking her down and injuring her.
 

 Initially, Mrs. Turner had stood very close to, if not on, the sideline. However, on finding it too crowded there, she moved hack some little distance, and she was about six feet from the sideline when she was struck. (Mrs. Dumas placed her mother’s distance therefrom at approximately twenty-one feet. However, the testimony of Mrs. Turner herself, Mr. Dumas and other witnesses placed her much closer at the time of the accident.)
 

 In the course of conducting such games, at Lakeshore the school officials had not only designated a restraining line or spectator zone by the “chalk line”, but they also assigned two male “duty teachers” specifically to effect what might be called “spectator control”. Part of their duties consisted of going up and down the sidelines and pushing the spectators back when they encroached too far into the zone between the restraining lines and sidelines of the field. Also the principal and assistant principal attended the game in their supervisory capacities and assisted the teachers. Further, it was understood that any other teachers at the game would assist in any manner found necessary, although they were not specifically on duty. The record reflects that this method of handling the spectators had been entirely satisfactory, and that prior to this incident there had been no instance of any injury suffered in the manner as occurred to Mrs. Turner.
 

 On the day in question the duty teachers had, several times before the accident, passed up and down the sidelines (particularly where Mrs. Turner was standing) admonishing the spectators to get behind the restraining line; and they had on at least one or two occasions actually caused them to move behind it. In fact, Mr. John Langdon, one of the duty teachers, specifically remembered the incident; and he observed, with respect to the players’ going out of bounds, that “I had just moved that
 
 *817
 
 .group back.” (This, incidentally, may account for Mrs. Dumas’ belief that her mother was approximately twenty-one feet from the sideline when the accident occurred. That is, she may have, a few minutes before, seen her moved back and had not realized that she had come forward .again.)
 

 In at least one instance shortly before the accident players had gone out of bounds in the very area where plaintiff was standing, and the officials had cautioned the spectators there to move back. Also some twenty minutes or so prior to the play on which Mrs. Turner was injured another play had occurred which carried the players off the field on the west side (opposite Mrs. Turner), it requiring a lady who was sitting at that point to scramble back to keep from getting hit.
 

 While Mrs. Turner stated that no warning had been given specifically to her personally, she freely admitted having observed the actions and heard the admonitions of the duty teachers to the crowd generally, as well as those of the officials. She likewise stated that she had noticed the out-of-bounds play on the opposite side of the field.
 

 The defendant urges that, under these circumstances, there was no negligence on the part of the school officials. Alternatively, it argues that, if there was a danger so apparent as to have required the taking of additional precautions by it to avoid injury to the spectators, Mrs. Turner herself was guilty of contributory negligence- and/or assumption of risk in that she placed herself in a position of obvious danger.
 

 Plaintiff, however, insists that the defendant was guilty of negligence for having failed to erect physical barriers which would have kept Mrs. Turner a safe distance from the playing field, or at least it should have posted warnings or given her such notice as to the danger of her position. In this connection plaintiff urges that a duty was particularly owed to her as a person uninformed as to the nature of football and how the game is played, and as to one who was unaware that the play of the game might bring players off the field at the place where she was standing. Of course, she must assume this position, because, as was observed in Colclough v. Orleans Parish School Board et al., La. App., 166 So.2d 647, “ * * * It is knowledge common to all who have watched football games, or viewed such games on television, that ofttimes as a result of momentum generated in executing plays, players cannot avoid running beyond the limits of the playing field and as a result accidents may occur. Many times have we seen photographers and others who ventured too close to the side lines knocked head over heels by players overrunning the boundary. * * * ” (Any
 
 *819
 
 one who has had even a minimal knowledge or exposure to football as played today is aware of the risk that is involved in staying too close to the sidelines.)
 

 The question of whether or not the defendant was negligent in failing to give warning to, or specially restraining the movements of, a spectator such as Mrs. Turner depends on whether her injury was
 
 reasonably
 
 foreseeable. We have examined Mrs. Turner’s testimony and, while we accept as true her assertion that she had never attended a “live” football game before and that she did not “intentionally” watch it on television, we find that she admitted that she had watched from time to time when her son was viewing televised games. And obviously she must have observed the games sufficiently to gain some knowledge of the dangers thereof, particularly since she voiced when testifying strong opinions and objections as to the manner in which they are played (she thought they were cruel).
 

 But be that as it may, we agree with the observations of the Supreme Court of Washington in Perry v. Seattle School District
 
 #
 
 1 et al., 66 Wash.2d 800, 405 P.2d 589, a case strikingly similar to the instant one and wherein plaintiff was denied recovery, that: “Whether or not the plaintiff was as completely ignorant of the game of football as her testimony indicates, is not controlling on the issue of negligence. The question of the ordinary care required of the defendant must, to some extent, be predicated upon the knowledge of the ordinary person of the risk involved. As Prosser suggests, the owner of a hockey rink is not required to ask each entering patron whether he has ever witnessed a hockey game before, but can reasonably assume that the danger of being hit by the puck is understood and accepted.”
 

 We do not believe, in this day of constantly televised football events at all levels, that it might
 
 reasonably
 
 be anticipated by school officials that among the family and friends of schoolboy athletes would be persons unaware of the fact that plays are often called which carry the players off-ficld and they sometimes run into persons standing close to the sidelines — camera men, officials, other players, spectators, etc.
 

 We think, too, that school officials might reasonably assume that the very nature of the sport itself would indicate to any reasonable person, who has observed only a few minutes of the playing, the possible risk involved in standing near the sidelines, even if we knew nothing of the game previously. Under these circumstances we think that it would be unreasonable to require such school officials to ascertain which spectators had no knowledge of the activity and to give them special warnings.
 

 
 *821
 
 As has been pointed out by our Courts of Appeal, where the vast majority of tort actions are heard on review, failure to take
 
 every
 
 precaution against
 
 all
 
 foreseeable injury to another does not
 
 necessarily
 
 constitute negligence. That would amount to making one an insurer of the other’s safety. The risk involved must be both foreseeable and
 
 unreasonable.
 
 And failure to perform any given act to guard against injury to another in connection with the risk constitutes negligence only when it appears that the performance of such act would have been undertaken, under the circumstances, by the reasonably prudent person.
 

 As was aptly pointed out in Goff v. Carlino et al., La.App., 181 So.2d 426, certiorari denied, which was approved in Miller v. Southern Farm Bureau Casualty Insurance Company, La.App., 189 So.2d 463, certiorari denied, “Negligence is conduct which creates an
 
 unreasonable
 
 risk of foreseeable harm to others. * * * The risk of foreseeable harm to others is
 
 unreasonable
 
 so as to be negligence if the magnitude of the risk created outweighs the utility or social value of the conduct creating it; in this respect consideration is given, inter alia, to the probability or extent of the harm to others threatened by the risk. * * * ” See also Prosser on “Law of Torts”, Third Edition, Section 31, pps. 148-153. (Italics ours.)
 

 In this connection we are impressed with the reasons of the district court that: “So the real question confronting us at this time is whether or not the defendant on this occasion took the proper precautions under the 'circumstances; or, putting it another way, was there a breach of duty or reasonable care to Mrs. Turner by the School Board? We think, all facts presented to the Court considered, that the School Board did exercise proper precautions under the circumstances and there was no negligence on its part causing or contributing to the injury to Mrs. Turner.”
 

 “The expense of providing a physical barrier alongside the football fields of these Junior ILigh Schools and the detriment to the utility of the area for other school purposes might result in some of the schools not being able to engage in football activity. * * * In this case, the school officials had provided for the protection of the spectators as they had been doing. There had been no injuries in the past with the school officials using these procedures, and we think there was no occasion for the school authorities to foresee any harm or injury to Mrs. Turner, under the precautions they were taking at the game.”
 

 To this we might add that evidence in the record discloses that, because these games have to be played in school yards on areas which must also be used for playground and other physical education pur
 
 *823
 
 poses, experience at those schools which do have some form of rope or chain barricades shows that sometimes they constitute nuisances and hazards to the students engaged in the other activities. Besides it was additionally shown that raised ropes or chains were not always successful in achieving their purpose inasmuch as spectators often came close to and even on the field merely by stooping ttnder them.
 

 In view of all of these circumstances we do not find that the school authorities were negligent for not providing physical, restraining barricades, or for not giving special warnings and protection to those persons in attendance who were not too familiar with the game. Their method, which had proved completely effective and satisfactory in the past, was sufficient.
 

 Our holding in the above respect makes it unnecessary, as a consequence, to discuss the defenses of contributory negligence and assumption of risk.
 

 For the reasons assigned the judgment of the Court of Appeal is reversed and set aside. The judgment of the district court dismissing plaintiff’s suit is reinstated and made the judgment of this court. All costs are to be borne by plaintiff.
 

 BARHAM, J., recused.