BLANCHE, Judge.
James R. Leake was the owner of a gasoline bulk plant located in the Town of St. Francisville where he was engaged in the sale and distribution, in bulk, of gasoline, kerosene, diesel fuel and related products. On the morning of February 13, 1968, a fire occurred at the plant at a time when premium gasoline was being pumped into one of Leake’s storage tanks by one Robert Paul Bertinot, the driver of a tank truck owned by Prudhomme Truck Tank Service, Inc. The fire completely destroyed the plant as well as the tank truck. Leake had obtained insurance on the plant property with Hanover Insurance Company in the sum of $5,000, and after the fire Hanover paid under its policy the full amount of said policy and was subrogated to the extent of their payment. Thereafter suit was instituted by Leake and Hanover against Prudhomme and its employee Bertinot seeking damages totaling $43,406.69 for Leake and $5,000 for Hanover. Prud-homme, after answering the suit, filed a reconventional demand against Leake for the value of their tractor and tank trailer and for the loss of revenue as a result of its ruin.
Trial was concluded on October 29, 1968, and the trial court on June 27, 1969, gave judgment to the plaintiffs as prayed for and rejected the reconventional demand filed by Prudhomme. Though this judgment was rendered on June 27, 1969, the Court did not sign a final judgment until September 5, 1969, when, after written reasons assigned, the Court reduced the award in favor of plaintiff Leake to $38,618.69.
The trial judge adopted the theory of plaintiffs’ expert witnesses, Dr. Oscar W. Albritton and Dr. Edwin R. Chubbuck, as to the cause of the fire. In rejecting the defendants’ claim that the fire was caused when plaintiff’s bulk tank overflowed, the trial judge branded the only witness to the fire, namely, defendant Prudhomme’s driver Robert Bertinot as unworthy of belief. Our review of the evidence leads us to conclude that not only was the evidence insufficient to sustain a judgment in favor of the plaintiffs but that plaintiff Leake was guilty of negligence which caused the accident. We further find that Bertinot was not guilty of negligence and additionally find that the Court’s conclusion that he was unworthy of belief was unjustified and manifestly erroneous. We reverse the judgment of the trial court in its entirety.
In the early morning of February 13, 1968, Bertinot arrived in St. Francisville with a load of premium gas to be delivered to Leake’s bulk plant. Upon arrival, he contacted Leake’s manager, R. M. (“Sonny”) Watson, for the purpose of opening up the plant in order for Bertinot to make *6 the delivery. Bertinot drove to the plant and was met by Watson, and after the necessary connections from the trailer tank to the line leading to the premium tank were made, Bertinot began the pumping operations from the trailer tank to the premium tank. In order to pump the gas up to the premium tank, it was necessary to keep the diesel engine of the truck operating in order to power the pump on the trailer tank. After Watson had opened the plant and assisted Bertinot, he then returned to his home, leaving Bertinot alone at the plant.
At this point a description of the plant and its surroundings is appropriate. The plant consisted primarily of five elevated storage tanks and two small buildings used as a warehouse and a garage. The warehouse and garage fronted on Ferdinand Street. A gravel parking area extended from the edge of the street to these buildings and was designed to permit tank trucks to pull up close to the warehouse and loading dock. The warehouse was a metal building which measured approximately twenty-one by twenty-three feet. It was supported by steel beams, elevated from two to three feet above ground level and rested on concrete piers. Through the warehouse ran the bank of pipes and valves which controlled the loading and unloading of storage tanks on the premises. Immediately adjacent to the right of the warehouse was a wood structure that served as a garage. It was constructed on a concrete slab. Behind these two buildings and to the north were five large cylindrical storage tanks which were laid out in three parallel rows. The row on the west was composed of two tanks laid end on end and separated by a space of some eighteen to twenty inches. The forward of these tanks was the diesel tank and behind it was the premium tank. The east row of tanks was similarly situated. In the center was one huge 17,000 gallon tank in which regular grade gasoline was stored. Each of these tanks was elevated some six to eight feet above ground level and rested in a saddle or cradle of steel supports which in turn rested on concrete footings. Just north of the diesel tank in the east row, and as previously mentioned, approximately one and a half feet away, stood the tank which was being filled at the time of the fire with the premium gasoline.
Admitted into evidence are a contour map and photographs which depict the lay of the land on which the bulk plant was situated. Mr. Raul Gonzalez, a civil engineer, prepared a contour map showing the location of the bulk tanks involved, the place where the trailer tank was situated as well as the drain to the street. Photographs reflect the remains at the bulk plant after the fire and the location of the diesel tank and the premium tank which overflowed and which was immediately to the rear of the diesel tank. Another photograph reflects the property as it appeared from the rear to the front and shows the drainage of the land to be toward the location of the truck. Another photograph reflects the slope of the property around the diesel and premium tanks to be to the west toward the drainage gully or swale which leads from the front of the property. Another photograph was taken from the high bluff in the rear of the property on the northern side and gives an aerial view of the site after the fire was extinguished. The contour map prepared by Mr. Gonzalez reflects that there was a distance of fifty-five and a half feet from the premium tank to the trailer tank, and the elevation at the premium tank was two feet higher than the elevation at the trailer tank. The photographs as well as the contour map show beyond any doubt that the drainage was from the rear of the property to the front and toward the drain which was located near the street and in the parking area where the truck and trailer tank were located.
Mr. Gonzalez testified that the ground area at the location of the bulk plant sloped from the rear to Ferdinand Street and to the west toward Tunica Street. Additionally, he identified an indentation along the west side of the bulk plant which *7 was referred to as a “gully” or a “swale” and which was a drain for the purpose of carrying fluid from the rear of the bulk plant on the north side toward Ferdinand Street on the south. As the photographs will reflect as well as the contour map, this indentation or natural drain runs past the site where the trailer tank was located to a grating or drain and under the front wheels of the truck which had been brought to stop in this indentation.
The only witness to the fire was Robert Bertinot. After the pumping operation had commenced, he got into the cab of his truck and stated that after thirty-five or forty minutes he got out of the truck and climbed up on top of the trailer tank and looked inside for the purpose of checking how much fuel he had left. He estimated at that time there was approximately 1,000 gallons left in the tank so he got back into his truck. Thereafter and while the pumping operation was continuing, his attention was attracted by a noise which he described as “a breaking noise” and then observed that gasoline was falling from one of the tanks onto the ground. He immediately cut off the engine of the diesel truck and the discharge pump but instead of the engine cutting off, it picked up gasoline fumes and began to race or run away. With the gasoline pouring out of the premium tank and the engine of the truck running away, Mr. Bertinot evidently did not think to pull an emergency shut-off lever that would have shut down the engine. He ran and was no more than fifteen feet away when the truck went up in flames. Deputy Daniel of the East Feli-ciana Sheriff’s Department immediately came to the scene of the fire and found Bertinot “half scared to death” and Bertin-ot told him “he was sitting in his truck pumping the gas, and said when he first noticed gas running down the side of the plant towards his truck, that he immediately tried to cut the truck off, but said before he could kill the motor, that the diesel had picked up the fumes of the gas and set it off.” (Deposition of Willis M. Daniel, Record, p. 813) We believe that such a statement made to Deputy Daniel is of impressive weight and was given at a time when Bertinot was under stress and at a time when the emergency of the situation was such that the statement could not have possibly been contrived with improper design or motive. While the truth of this statement is corroborated by other evidence, we feel it necessary to make reference to it here inasmuch as it is persuasive evidence that Bertinot was not lying and that the trial judge’s finding that he was unworthy of belief was manifestly erroneous.
The other evidence to which we refer is the contour of the land which is such that in the event of overflow of the premium tank the gasoline would find its way downhill to the place where the evidence shows the diesel truck was parked. Additionally, that the tank overflowed is corroborated by the fact that Leake ordered more gasoline than the tank would hold.
Immediately after the fire, it was originally believed that the escape of gasoline from the premium gasoline tank was the result of a rupture of the tank while it was being filled. Dr. Oscar Albritton, a metallurgist, was called to disprove this theory; and without a lengthy discussion of the evidence, it is obvious that the rupture in the premium tank was occasioned when there was an explosion in the adjoining diesel tank causing the diesel tank to jettison and crash into the premium tank. Having disposed of the rupture-in-the-tank theory as a reason for the escape of the unfriendly gasoline, Dr. Albritton was then called upon to give his expert opinion as to the cause of the fire. Needless to say, except for the escape of gasoline, there would have been no fire. Examination of the remains of the truck revealed that a portion of the exhaust pipe was melted. Additionally, the pipe had melted in a place opposite the discharge pump to which was connected a hose by which gasoline was pumped from the trailer tank and no other portion of the exhaust pipe had melted. From this fact it is *8 theorized that heat of a greater intensity had to have been exerted on the exhaust pipe at that particular point. Dr. Albritton then ventured that the excess heat came from gasoline that escaped from the discharge hose coupling when it either broke or became disengaged, thus spewing gasoline therefrom on the hot exhaust and causing it to melt. As to how the coupling became disengaged, it was suggested that either the coupling was defective or became disengaged as a result of vibration caused by a surging action of the discharge pump when the rear compartment of the trailer tank became empty. Plaintiffs’ theory of the case as to the cause of the fire as based on the opinion of their expert witnesses may be possible but in our view improbable. But as far as plaintiff’s right to recover for the destruction of his bulk plant, we believe that proof of a melted portion of the exhaust pipe in the inferno that ensued when the plant exploded and went up in flames is insufficient evidence of a defective hose coupling from which the gasoline escaped. Thus, we hold that plaintiff failed to prove his case by a preponderance of the evidence.
As we noted in Stevens v. Liberty Mutual Insurance Company, 133 So.2d 1 (La.App. 1st Cir. 1960), and later in Moorehouse v. Gallow, 156 So.2d 62 (La.App. 1st Cir. 1963),
“Recent jurisprudence tends to minimize the weight to be accorded so-called expert tests and experiments predicated upon assumptions not necessarily proven or upon variable factors which are not established with reasonable certainty and precision in the particular cases involved.” (Stevens v. Liberty Mutual Insurance Company at p. 10)
With regard to the expert opinion advanced by plaintiffs’ witnesses, we are of the opinion that it was predicated upon assumptions not proven or upon variable factors which were not established with reasonable certainty.
Plaintiff also relies on the doctrine of res ipsa loquitur which we also find to be inapplicable. Beyond question plaintiff’s employee Watson believed the premium tank would hold the order of gasoline. Otherwise he certainly would not have helped the driver hook up the hose to the premium tank connection in the pumphouse and then leave the premises for his own purposes while the pumping operation was going on without making such fact known to the driver. We believe that the responsibility for safely receiving the delivery of the gasoline devolved on plaintiff, and it was his duty to determine whether his tank would hold the order of gasoline. The error in ordering more gasoline than the. tank would hold was due to plaintiff’s failure to either heed or keep a proper inventory of the gasoline in the tank or his failure to gauge the tank properly before delivery. That plaintiff’s gauging practice was inadequate as a matter of common sense was brought out by Mr. Allen Hyn-son who had been a bulk plant operator for thirty years and who testified that he gauged his tanks about three times a week so the tanks would not run over thereby running his money on the ground and creating a fire hazard.
The order to Bertinot was not to fill plaintiff’s tank, thus imposing a duty upon him to see that it did not overflow, but to pump an order of 8,262 gallons of premium gasoline into a tank which he had every right to assume would accommodate delivery. Thus, the failure of plaintiff’s duty in this regard was negligence that caused the premium tank to overflow and resulted in the ultimate destruction of his bulk plant. Res ipsa loquitur, therefore, cannot apply where plaintiff is also at fault. The following quotation from the case of Arnold v. United States Rubber Company, 203 So.2d 764 (La.App. 3rd Cir. 1967) is in point:
“ * * * In Pilie v. National Food Stores of Louisiana, Inc., 245 La. 276, 158 So.2d 162 (1963), our Supreme *9 Court said ‘each case must be decided on its own facts and circumstances, and * * * res ipsa loquitur will not be applied unless the facts and circumstances indicate that the negligence of the defendant, rather than the negligence of others, is the most plausible explanation of the accident.’ See also Fruge v. Trahan, 194 So.2d 478 (La.App. 3d Cir. 1967)” (Arnold v. United States Rubber Company at p. 769)
Furthermore, the plant was not under the control of defendant’s driver when plaintiff’s agent abandoned his duty to supervise the delivery of the gasoline. We are also of the opinion that plaintiff’s agent was negligent in leaving the plant and thus abandoning his duty to see that the order of gasoline could be received in safety, and his leaving did not impose such a duty on the driver of the delivery truck.
If there was any negligence on the part of Bertinot, it was due to his failure to observe the gasoline flowing out of the vent in the premium bulk tank, which was in the rear of the diesel tank and some fifty-five and a half feet away, before the overflow of gasoline reached his truck. However, Bertinot had no reason to anticipate the tank would overflow, and in our view his primary duty was to see that the pumping operation was safely executed, leaving the bulk plant operator the duty to see that the order could be received by the plant in safety. By this we do not mean to say that the driver of the delivery truck can start the pump and close his eyes while pumping a liquid as volatile and dangerous as gasoline. We do say that in this case there was no reason for the driver to assume that the tank would overflow, especially since spillage or overflow is infrequent as attested to by Watson, who stated that to his knowledge it only occurred six times in twenty years.
Prudhomme’s truck and trailer tank were completely destroyed and it is, therefore, entitled to recover their value. The truck was a 1965 White, Model 9064TD, truck which Mr. Jack Flynn, the Manager of White Motor Corporation, valued at $9,500. Mr. Wilburt J. Ducharme, General Manager of Prudhomme, testified to the value of comparable trailer tanks, and we accept the value of $3,624.20 of the trailer tank as reasonable. We are of the opinion that the proof was insufficient to establish the value of the accessories separate and apart from the value of the truck and trailer and additionally find the proof as to the loss of profits while the tank trailer was being replaced is likewise insufficient and therefore deny recovery for those items. Therefore, the judgment of the District Court in favor of the plaintiffs James R. Leake and Hanover Insurance Company and against Prudhomme Truck Tank Service, Inc., and Robert Paul Ber-tinot is reversed and set aside at plaintiffs’ costs. The judgment rejecting the recon-ventional demand of the Prudhomme Truck Tank Service, Inc., is also reversed and set aside. Accordingly, judgment is rendered in favor of Prudhomme Truck Tank Service, Inc., and against James R. Leake in the sum of $13,124.20 from date of judicial demand, together with all costs of court.
Reversed and rendered.