258 So.2d 358

James R. LEAKE and Hanover Insurance
Company

v.

PRUDHOMME TRUCK TANK SERVICE,
INC. and Robert Paul Bertinot.

No. 50862.

June 28, 1971.

On Rehearing Jan. 17, 1972.

Rehearing Denied Feb. 21, 1972.

Kilbourne, Dart & Jackson, Stephen P. Dart, St. Francisville, Durrett, Hardin, Hunter, Dameron & Fritchie, Calvin E. Hardin, Jr., Emile C. Rolfs, III, Baton Rouge, for plaintiffs-appellees-relators.

Robert L. Kleinpeter, Baton Rouge, Domengeaux, Wright & Bienvenu, William P. Rutledge, Lafayette, for defendants-appellants-respondents.

McCALEB, Chief Justice.

The defendant, Prudhomme Truck Tank Service, Inc. (hereinafter referred to as Prudhomme), is in the business of delivering bulk gasoline and other related products. Defendant Robert Paul Bertinot is an employee of Prudhomme and a driver of one of its tank trucks used in making deliveries.

The plaintiff, James R. Leake, is the owner of a plant in the Town of St. Francisville where he engaged in the bulk sale and distribution of gasoline, kerosene, diesel fuel and other products. An insurance policy issued by the Hanover Insurance Company, a co-plaintiff, insured him against loss or damage to his inventory and also covered his tort liability, each coverage having a $5,000 limit.

On the morning of February 13, 1968, Bertinot was making a delivery of premium gasoline to Leake's plant, and while he was in the process of filling one of the storage tanks from his trailer tank, a fire occurred which destroyed the plant and Prudhomme's tank trailer-truck.

Hanover Insurance Company paid Leake $5,000 in accordance with the indemnity provisions of its policy. Thereafter, it and Leake instituted the instant action against Prudhomme and its employee Bertinot seeking damages for destruction of the plant. Leake claimed damages in the sum of $43,406.69, and Hanover, $5,000. Prudhomme and Bertinot answered, denying liability. Further, Prudhomme reconvened against Leake and his insurer for the value of its tank trailer-truck, and for damages for loss of use thereof.

The trial court rendered judgment in favor of Leake in the amount of $38,618.69, and in favor of Hanover in the amount of $5,000. It dismissed Prudhomme's reconventional demand.

The Court of Appeal reversed the judgment in its entirety. It dismissed plaintiffs' suit and rendered judgment in favor of Prudhomme on its reconventional demand in the amount of $13,124.20 against Leake.[1] 238 So.2d 4.

We granted certiorari.

The storage plant fronted on Ferdinand Street near its intersection with Tunica Street. It consisted of five metal storage tanks, raised some six to eight feet off the ground, which held the various types of fuel stocked by Leake. They were located to the rear of the property. Also there were two buildings, a warehouse and garage. The warehouse was located toward the front of the property and was situated so that the trucks coming in to make deliveries would be aligned almost parallel to the warehouse. The property slopes, from the rear portion (where the tanks are located), in a southwesterly direction, creating a natural drainage in that direction into Tunica Street and Ferdinand Street near its intersection with Tunica. However, a small swale which runs from near the tanks to Ferdinand Street diverts some of the drainage in a more southerly direc-

1. Leake died while the case was pending on appeal. The administrator of his succession, James R. Leake, Jr., was substituted as a party plaintiff and as a defendant, in reconvention.

tion to a drain located on Leake's property, near Ferdinand Street.

Bertinot was the one eyewitness to the catastrophe. He testified that shortly after 6 o'clock in the morning of February 13, 1968, he arrived in St. Francisville with the load of premium gasoline he was to deliver from Avondale, Louisiana to the Leake plant. Inasmuch as the plant was not then open, he telephoned R. M. "Sonny" Watson, the plant manager, and requested that he open the plant so that the delivery could be made, which Watson agreed to do. On entering the plant Bertinot parked the truck more or less parallel to the warehouse (and to Ferdinand Street) with its front wheels in or near to the swale. The cab of the truck protruded past the warehouse, so that a person sitting in the cab could look past the warehouse and at two of the storage tanks. The forward visible tank was partially filled with diesel fuel. Behind it, and some fifty-five feet from the cab of the truck, was the premium gasoline tank into which the gas on the Prudhomme truck was to be delivered.

Bertinot and Watson made the connections necessary to effect transfer of the gas from the trailer to the storage tank.[2]

The latter signed the "ticket" and, with Bertinot's knowledge, left the plant to return home to get ready for his regular working day, leaving Bertinot to complete the delivery of the gasoline into the storage tank.

The transfer to the storage tank was effected by means of a pump located on the truck-trailer, the pump being activated by operation of the diesel engine of the truck. It was therefore necessary that the diesel engine remain running throughout the time required to empty the trailer tank.

Bertinot testified that after the pumping operation commenced he sat in the cab of the truck for about thirty to forty minutes at which time he got out, climbed on the trailer and looked into the tanks to see how much gas was left. He estimated that at that time there were about 1000 gallons left in the trailer tank. He got back in the cab and shortly thereafter he heard a "breaking noise" which caused him to look out. As he looked toward the rear of the property, he saw a fluid which he thought to be gasoline falling to the ground from one of the tanks, either the diesel tank or the premium tank which he was filling, and that it was running down toward the truck.[3]

---

2. This consisted of coupling one end of a hose to an outlet on the tank and the other end to a connection at the plant warehouse.

3. Because the diesel tank was in front of the premium tank it blocked full view of the premium tank. Consequently, it is understandable that Bertinot could not

According to his testimony Bertinot then turned off the pump and the truck's ignition. Instead of stopping, however, the engine began to race, apparently burning gasoline vapors from the outside. Becoming alarmed Bertinot jumped from the cab and ran across Ferdinand Street. As he ran across the street he fell, and by the time he got up the fire had started.

The record reflects that because of the mechanics of a diesel engine it cannot be stopped in the presence of "outside" gas vapors, merely by shutting off the ignition, because it will continue to operate by burning the vapors. However, the Prudhomme truck was equipped with a readily available emergency shutoff, or compression release, which is designed to shut down the operation of the engine under just such circumstances as existed here. Although Bertinot had been instructed in the use and function of the emergency shutoff he did not activate it, stating that although the engine did not stop when he turned off the ignition, he "really did not think about that emergency shutoff."

The plaintiff, contending that Bertinot was in control of the operations at the time of the fire, pleaded the doctrine of res ipsa loquitur. Alternatively, by use of expert witnesses, they attempted to show

that the fire could have been, and probably was, started by gas escaping from a loose or defective coupling on a tank trailer, or from a break in the hose near the coupling. This theory, provided by Dr. Oscar Albritton, is premised particularly on the finding of Dr. Albritton after the fire that a portion of the exhaust pipe, which has a very high melting point, had been melted in the area of the coupling, which indicated to him that there must have been an excessive amount of fuel burning at this point. He surmised, therefore, that a break in the hose or coupling permitted the escape.

The defendants, on the other hand, urge that the doctrine of res ipsa loquitur is not applicable inasmuch as Bertinot was not in charge and control of the plant, but, rather, that he had control only of his vehicle, and that, therefore, defendants could not be expected to defend against all other possibilities, on the doctrine of res ipsa loquitur. They contend that the evidence establishes that the fire was caused because of the fact that Leake had ordered more than 400 gallons of premium gasoline over the capacity of his storage tank, and that the overflow of this gas from the vent in the tank was the cause of the fire. They argue that the escaping gas from the storage tank ran down the swale, as testified by Bertinot, and directly under the truck;

then be sure from which tank the fluid was coming, although he said that his immediate thought was that the premium tank he was filling had ruptured and

was leaking the gas. This is what he told persons at the scene of the fire while it was still in progress.

that the operation of the truck's engine set up convex currents which caused the gas vapors to rise into the engine, accounting for its runaway action; that sparks, created when the motor backfired on the sudden speed-up, ignited the vapors which resulted in flashback conflagration toward the tanks, causing the ensuing holocaust.

There is no doubt but that the gasoline overage was ordered. In fact, it is conceded by plaintiffs. To show that this factor was the cause of the fire defendants rely principally on the testimony of Bertinot, heretofore related, that when the pumping operations were almost complete he saw gasoline coming from the area of the premium tank and down toward the truck.

In rendering judgment for plaintiffs, the trial court decided the case on the basis of the expert testimony, holding that Bertinot's testimony could not be accepted as credible.

The Court of Appeal, however, reached a contrary conclusion, holding that the trial court erred in completely discounting the testimony of the only eyewitness to the occurrence.

In this Court plaintiffs strenuously urge that we adhere to the conclusion of the trial court in this respect. However, after reviewing all of the testimony and evidence of the record, we are constrained to agree with the Court of Appeal, that there was no basis for disbelieving Bertinot's testimony. There is no countervailing testimony. Nor is his testimony in conflict with any of the factual circumstances. To the contrary, the physical facts are entirely consistent with his version of what occurred. Moreover, in addition to expert testimony to the effect that the fire could have started in this manner, there is evidence in the record of a fire actually having occurred as a result of an overflowing gas tank which was being filled.

Concededly, there are some discrepancies in the testimony given by Bertinot in his deposition and that given at the trial. But we deem them minor in that they involve unimportant details of actions done routinely by him in his job. Special note is not taken of such tasks, unless something unusual occurs. Consequently, it is not surprising that recollection of them becomes dimmed with passage of time. One alleged discrepancy particularly asserted by plaintiffs is that Bertinot related in his deposition that "almost immediately" after he got back into the cab of the truck (after checking his tanks) he heard the "breaking noise", whereas, at the trial he testified that he heard the noise about ten or fifteen minutes after he got back into the cab.

We do not find anywhere in the deposition that Bertinot used the phrase "almost immediately". The words were those of plaintiffs' counsel when he put to Bertinot the following question: "Now, as I re-

member your testimony, you said that you got back into the cab and this incident occurred almost immediately after that, is that correct?" To which Bertinot responded, "Yes." No clarification was made at that time as to what the witness might have understood by the phrase "almost immediately". Relatively, five, ten or fifteen minutes could have been included.

While the theories of plaintiffs' expert witnesses might prove helpful in arriving at the cause of the fire, if there had been no eyewitness account as to what happened, we do not think that they can prevail over the effect of Bertinot's testimony, coupled with the undeniable fact that more gas was being pumped into the tank than it could hold, and the coincidence that the trouble began at about the time that the excess gas was being forced into the tank.[4]

We might also observe that the excessively melted exhaust pipe (on which Dr. Albritton's hypothesis is based) is not at all inconsistent with defendants' theory of the occurrence. Clearly, the fire started in the area of the truck. It is entirely possible that the initial heat could have burned the hose covering in the area of the coupling, permitting gravity drainage of gasoline from the storage tank out of the hose there (before the storage tank ultimately ruptured and emptied its contents on the ground). The gas so escaping from the melted hose at that point would then provide sufficient fuel to melt the pipe. Such a possibility was recognized by Dr. Albritton himself, albeit he said that he did not "believe" that the fire resulted from the overflowing storage tank.

We conclude, therefore, that the Court of Appeal correctly found that the defendant has established that the primary, or initial, cause of the fire was Leake's negligence in miscalculating the amount of gas which could safely be put into his storage tank.[5] And for this reason it properly dismissed plaintiffs' suit against Prudhomme and Bertinot.

We think, however, that the Court of Appeal erred in allowing Prudhomme re-

4. We discount entirely the argument made in plaintiffs' briefs that Bertinot's testimony shows that, because there were still 1,000 gallons left in *one* of the truck's three tanks when he checked them shortly before the trouble started, the other tanks still contained gas, and that the overage could not then have been flowing into the storage tank. The record reveals that the valves to all three of the tanks were open and they were emptying simultaneously. Besides, the clear import of his testimony was to the effect that he had about a *total* of approximately 1,000 gallons—not 1,000 gallons in any one tank.

5. This conclusion makes our consideration of the plea of res ipsa loquitur unnecessary. Because even if it could be said that Bertinot had such control over the premises as to make the doctrine applicable, the defendants have successfully established the origin of the fire and the negligence of Leake was a causative factor.

covery on its reconventional demand, based on the conclusion that Bertinot was free from negligence in failing to timely observe the overflow, because it was the duty of Leake's employees to receive the gas safely.

In our opinion Leake was under no greater duty to receive the gasoline safely than Prudhomme was to deliver it safely. Indeed, most of the shut-off mechanisms which might have prevented ignition of the overflowing gasoline, had it been timely detected by anyone, were on the truck and solely under the control of Bertinot. Furthermore, it is clear that Watson's presence during delivery of the gasoline was neither necessary nor required. It was freely admitted by Bertinot that the procedure followed on the morning of February 13, 1968 had been followed on numerous occasions —that is, Watson would open the plant, sign the ticket and he (Bertinot) would complete the emptying of the trailer tank, unhook the connections and leave. He also said that on many occasions, the plant was left open and that he, alone, *started and completed the entire delivery.*

In view of the highly dangerous nature of the commodity involved, Bertinot, knowing that none of Leake's employees was present, had the obligation of keeping a proper lookout to be sure that the delivery process was proceeding smoothly and safely. This he admitted he did not do. Although the gas was escaping at a rapid rate, the record shows that a large portion of it flowing from the storage tank would have followed the natural drainage pattern, away from the truck. Consequently, it must have taken more than a few seconds for enough gas to flow under the truck by way of the swale which contained grass and some debris, puddle thereunder and vaporize sufficiently to cause the engine to accelerate.

By the slightest attention on his part, Bertinot, even without having gotten out of the truck's cab, could have observed the gasoline overflow when it commenced, instead of later when it was almost too late to take precautions to avoid the disaster.[6] His conduct in this respect was highly negligent, and was a significant contributing cause leading to the ultimate unfortunate result. This negligence, attributable to his

6. Although we note that Bertinot was probably negligent in failing to make use of the emergency shut-off, designed to stop the operation of his engine under the existing conditions, we do not rest our decision on this basis, in view of defendant's argument that at the time he discovered his danger he was acting under the pressure of a "sudden emergency" brought about by Leake's negligence. Nevertheless, under the facts above shown, we are compelled to the conclusion that had he observed the escaping gas when he should have, his peril would not then have been so imminent, and he would have had sufficient time to exercise the proper safety precautions.

employer, Prudhomme, precludes recovery by the latter on its reconventional demand.

For the reasons assigned the judgment of the Court of Appeal insofar as it awards $13,124.20 in favor of Prudhomme Truck Tank Service, Inc., on its reconventional demand, is reversed and set aside, and the reconventional demand is dismissed. The judgment is further amended so as to cast plaintiffs and defendants for payment of costs, in equal portions. In all other respects the judgment of the Court of Appeal is affirmed.

BARHAM, Justice (dissenting).

Both the Court of Appeal and the majority have found the plaintiff Leake to be negligent. While the Court of Appeal failed to find that the evidence preponderated as to the defendants' negligence, the majority of this court has determined otherwise. I am willing to accept the majority's determination of the causes in fact, the risks involved, and the duties owed. Under these determinations as assigned by the majority, since this court applies the doctrine of last clear chance I must conclude that the plaintiffs are entitled to recover.

The majority holds:

"In our opinion Leake was under no greater duty to receive the gasoline safely than Prudhomme was to deliver it safely. * * *

"In view of the highly dangerous nature of the commodity involved, Bertinot

[Prudhomme's employee], knowing that none of Leake's employees was present, had the obligation of keeping the proper lookout to be sure that the delivery process was proceeding smoothly and safely. * * *"

"By the slightest attention on his part, Bertinot, even without having gotten out of the truck's cab, could have observed the gasoline overflow when it commenced, instead of later when it was almost too late to take precautions to avoid the disaster. * * *

"* * * Nevertheless, under the facts above shown, we are compelled to the conclusion that had he [Bertinot] observed the escaping gas when he should have, his peril would not then have been so imminent, and *he would have had sufficient time to exercise the proper safety precautions*." (Emphasis mine.)

The court's determination that Bertinot was "highly negligent" under the above conclusions requires the application of the last clear chance doctrine and allows recovery to plaintiffs. I respectfully dissent.

TATE, Justice (dissenting).

The writer respectfully dissents. In the writer's opinion, Leake was not negligent; but, even accepting the majority's premise that he was, then Bertinot, the defendants' delivery driver, had the last clear chance to avoid this accident.

The majority finds Leake negligent in ordering more gasoline than his tanks could hold. This error in calculation does not, in my opinion, constitute negligence.

Negligence is conduct which creates an unreasonable injury of foreseeable harm to others. Turner v. Caddo Parish School Board, 252 La. 810, 214 So.2d 153 (1968); Restatement of Torts 2d, Sections 284, 291–293. Liability for negligence involves a breach of a duty owed to the person injured. Day v. National U. S. Radiator Corp., 241 La. 288, 128 So.2d 660 (1961).

In the present instance, I am unable to see what duty Leake breached or what undue hazard he created by miscalculating the amount of gasoline he needed. As the majority opinion notes, the man delivering the gasoline has the obligation of keeping a proper lookout and assuring safe delivery of his product. Leake could no more expect the delivery man to be so deficient in lookout to permit the gasoline to overflow and cause this disastrous fire, than could any corner service station expect the delivery truck to put more gasoline in its tanks than the tanks hold. ¶ As we stated in Turner, at 214 So.2d 157: "* * * failure to take *every* precaution against *all* foreseeable injury to another does not *necessarily* constitute negligence. That would amount to making one an insurer of the other's safety. The risk involved must be both foreseeable and *unreasonable*. And failure to perform any given act to guard against injury to another in connection with the risk constitutes negligence only when it appears that the performance of such act would have been undertaken, under the circumstances, by the reasonably prudent person."

I thus disagree with the majority finding of negligence on the part of Leake or his employees.

However, even conceding such negligence, the defendants' driver, Bertinot, had the last clear chance to avoid the accident and the resultant injuries. Under our last clear chance doctrine, even though a plaintiff be contributorily negligent, a defendant who observes or who should by reasonable care observe the peril of another may be held responsible for injuries caused by an accident if, after the peril arises, the defendant has a reasonable opportunity to observe it and thereafter also has the reasonable opportunity to avoid the accident. Williams v. City of Baton Rouge, 252 La. 770, 214 So.2d 138 (1968); Belshe v. Gant, 235 La. 17, 102 So.2d 477 (1958).

In the present instance, after the gasoline started overflowing, Bertinot had the reasonable opportunity to observe same and to have operated the shut-off mechanism designed to avoid ignition of overflowing gasoline, which mechanism was solely under Bertinot's control. Under our jurisprudence, Bertinot had the last clear chance to have avoided the accident, even

conceding (as the writer does not) that Leake was contributorily negligent.

For these reasons, the writer respectfully dissents.

## ON REHEARING

SANDERS, Justice.

We granted plaintiffs' application for a rehearing because of their forceful argument that we had misapplied the doctrine of contributory negligence to bar their recovery.

The facts may be briefly summarized. About February 12, 1968, James R. Leake, operator of a bulk gasoline plant at St. Francisville, ordered 8,262 gallons of premium gasoline. Prudhomme Truck Tank Service, Inc., a carrier of gasoline, undertook to deliver the gasoline in a diesel-powered tank truck driven by its employee, Robert Paul Bertinot. He arrived at St. Francisville with the gasoline about 6:00 a. m. on February 13. Since the plant was closed at that early hour, he telephoned R. M. Watson, the plant manager, and requested that he open the plant so that delivery could be made. Clad in house slippers, Watson opened the plant for the delivery. Bertinot parked his truck parallel to the warehouse, with the cab protruding, so that a person sitting in the cab could see two of the storage tanks. The first of these tanks contained diesel fuel. The second, some fifty-five feet from the cab, was the premium gasoline tank into which

the gasoline on the Prudhomme truck was to be pumped.

Watson assisted Bertinot in coupling the delivery hose from the tank to a connection at the plant warehouse. Then, Watson signed the ticket and, with Bertinot's knowledge, returned home to get ready for his regular working day.

This procedure conformed to a practice, followed on numerous occasions, whereby Watson would open the plant, sign the ticket, and leave Bertinot at the plant to make his delivery. The truck driver would then pump the gasoline into the storage tank, unhook the hose, and depart. On other occasions, the manager left the plant unlocked so Bertinot would not be delayed in making delivery.

A pump on the tank truck propelled the gasoline through the hose to the storage tank. Since the pump was operated by the truck's diesel engine, it was necessary to keep the engine running until the delivery was complete.

Because a diesel engine cannot be stopped in the presence of "outside" gas vapors by shutting off the ignition, the truck was equipped with a readily available emergency shutoff, or compression release, to stop the engine when gasoline escaped. Bertinot had been instructed in the use of this safety device.

Bertinot testified that after the pumping operation began, he sat in the cab of the

truck for about thirty to forty minutes. He then got out, climbed on the trailer, and looked into the trailer tank to see how much gas was left. He estimated that about 1000 gallons remained. He re-entered the cab and shortly thereafter he heard a "breaking noise" which caused him to look out. As he looked toward the rear of the property, he saw a fluid which he thought to be gasoline falling to the ground from one of the tanks, either the diesel tank or the premium tank which he was filling. It was running down toward the truck.

According to his testimony, Bertinot then turned off the ignition switch to stop the engine and pump. Instead of stopping, however, the engine began to race, apparently burning gasoline vapors from the outside. Becoming alarmed, Bertinot jumped from the cab and ran across Ferdinand Street. As he ran across the street, he fell, and by the time he got up, the fire had started. Bertinot conceded that he "really did not think about the emergency shutoff."

The fire destroyed the bulk plant and Prudhomme's tank trailer truck. Although a conflict exists in the evidence, the evidence preponderates in favor of our factual determination that the fire started from an overflow of the premium gasoline tank into which gasoline was being pumped. The record also supports a finding that Leake had ordered about 450 gallons more gasoline than the tank would hold.

■ Gasoline and similar fuels are highly dangerous, and persons handling them are required to exercise a high degree of care commensurate with the danger. Home Gas & Fuel Co. v. Mississippi Tank Co., 246 La. 625, 166 So.2d 252 (1964); Naquin v. Marquette Casualty Co., 244 La. 569, 153 So.2d 395 (1963); Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627 (1953); Hake v. Air Reduction Sales Co., 210 La. 810, 28 So.2d 441 (1946); Jones v. Blossman, 209 La. 530, 25 So.2d 85 (1946).

■ On original hearing, we found the driver of the tank truck highly negligent. We adhere to this finding:

"In view of the highly dangerous nature of the commodity involved, Bertinot, knowing that none of Leake's employees was present, had the obligation of keeping a proper lookout to be sure that the delivery process was proceeding smoothly and safely. This he admitted he did not do. Although the gas was escaping at a rapid rate, the record shows that a large portion of it flowing from the storage tank would have followed the natural drainage pattern, away from the truck. Consequently, it must have taken more than a few seconds for enough gas to flow under the truck by way of the swale which contained grass and some debris, puddle thereunder and vaporize sufficiently to cause the engine to accelerate.

"By the slightest attention on his part, Bertinot even without having gotten out of the truck's cab, could have observed the gasoline overflow when it commenced, instead of later when it was almost too late to take precautions to avoid the disaster."

Despite the finding of negligence on the part of defendant's driver, we denied recovery to plaintiffs, because Leake had ordered more gasoline than his tank could hold. We concluded that his miscalculation of the gallonage constituted contributory negligence barring recovery. We now think we erred in so holding.

■ Assuming contributory negligence on the part of Leake, a proper application of the doctrine of Last Clear Chance requires a judgment for plaintiffs. Under this doctrine, broadly stated, the contributory negligence of the plaintif does not bar recovery for the negligence of the defendant, when it appears that the defendant by exercising reasonable care should have observed the peril after it arose and have avoided injurious consequences but failed to do so. Williams v. City of Baton Rouge, 252 La. 770, 214 So.2d 138 (1968); Belshe v. Gant, 235 La. 17, 102 So.2d 477 (1958); Jackson v. Cook, 189 La. 860, 181 So. 195 (1938); Rottman v. Beverly, 183 La. 947, 165 So. 153 (1936); Comment, The Last Clear Chance Doctrine in Louisiana—An Analysis and Critique, 27 La.L.Rev. 269.

In Williams v. City of Baton Rouge, supra, this Court stated:

"Ordinarily contributory negligence would bar plaintiffs' recovery. But the last clear chance doctrine has been approved in this state and this humanitarian rule of law, where applicable, forms an exception to the dogmatic approach which denies recovery on account of contributory negligence."

Under the facts shown, a business practice existed whereby the driver made delivery while alone at the plant. This practice permitted delivery during hours when the plant was closed and avoided costly time losses for both the driver and his tank truck.

In making delivery, the truck driver was under a duty to guard against the fire hazard created by overflow of the gasoline storage tanks. In fact the ignition switch and emergency shutoff were under the driver's exclusive control.

As we observed on original hearing, by the slightest attention on Bertinot's part, he could have observed the gasoline overflow when it commenced, in time to take safety precautions. Proper observation would have afforded him ample time to stop the motor, the only source of ignition, and have prevented the fire. Because of his heedlessness during the dangerous pumping operation, the driver failed to use a clear chance to avert the disastrous

consequences, at a time when the plant operator was helpless to do so.

■ Under these circumstances, plaintiffs are entitled to recover despite the defense of contributory negligence.

Conformable to our practice, the case should be remanded to the Court of Appeal for the assessment of damages. See Dixie Drive It Yourself Sys. v. American Beverage Co., 242 La. 471, 137 So.2d 298 (1962); Felt v. Price, 240 La. 966, 126 So.2d 330 (1961).

For the reasons assigned, the judgment of the Court of Appeal is reversed, and the judgment of the district court on the main demand in favor of plaintiffs and against the defendants is reinstated as to liability and made the judgment of this Court. Accordingly, judgment is rendered on the main demand in favor of plaintiffs and against the defendants in such sum as may be hereafter fixed, and the case is remanded to the Court of Appeal, First Circuit, for the assessment of damages. The demands of Prudhomme Truck Tank Service, Inc., plaintiff in reconvention, are rejected. All costs are taxed against the defendants in the main demand.

## ON REHEARING

McCALEB, Chief Justice (dissenting).

I cannot subscribe to the majority holding that Bertinot had the "last clear chance" to avoid the disaster which occurred. In the majority opinion it is stated that "because of his heedlessness during the dangerous pumping operation, the driver failed to use a clear chance to avert the disastrous consequences." However, this heedlessness constituted, as we originally held, his initial negligence. (This holding is approved in the majority opinion.) To this extent, the majority has misapplied the doctrine of last clear chance.

The doctrine is appropriate and places a duty on the defendant to act when, as stated in Williams v. City of Baton Rouge, 252 La. 770, 214 So.2d 138, " * * * a plaintiff negligently puts himself in a place of danger and his *negligence and danger are actually discovered by defendant * * *.*" The Court succintly pointed out in the Williams decision that "In the application of this doctrine, it is pertinent *and material* to ascertain whether the defendant could, *after discovering plaintiff's peril,* have averted the accident by the exercise of due diligence." (All emphasis added.)

As I view the evidence in the instant case, when Bertinot discovered the peril (brought about by the combination of his and plaintiff's negligence), the danger to his own life was imminent. The record shows that, to Bertinot's knowledge, accidents of this nature have occurred in the past, and that at least one resulted in the truck driver's death. Consequently, when he observed the gasoline running toward the truck, and the engine failed to respond to his turning off

the ignition, he took the action, which the average ordinarily prudent person would take—he got away as fast as he could. As it was, he was only half way across the street when the truck burst into flames. True, he did not think to use the emergency shutoff. However, since he was acting under the sudden emergency presented, he should not be held accountable in view of the circumstances for being primarily concerned about his own safety. Besides, there is nothing in the record which shows that, at the time he left the vehicle, the use of the emergency shutoff would have been effective.

I cannot conclude therefore that, *after discovering the danger*, Bertinot had a last clear chance to avert the accident.

For the reasons stated herein and in our original opinion, I respectfully dissent.

HAMLIN, Justice (concurring in part and dissenting in part):

I concur in that part of the majority opinion which finds Robert Paul Bertinot, employee of Prudhomme Truck Tank Service, guilty of negligence.

I dissent from that part of the majority opinion which holds:

"Assuming contributory negligence on the part of Leake, a proper application of the doctrine of Last Clear Chance requires a judgment for plaintiffs. Under this doctrine, broadly stated, the contributory negligence of the plaintiff does not bar recovery for the negligence of the defendant, when it appears that the defendant by exercising reasonable care should have observed the peril after it arose and have avoided injurious consequences but failed to do so. * * *"

Before the doctrine of last clear chance may be applied, three essential facts must be established: (1) that the injured party was in a position of peril of which he was unaware or from which he was unable to extricate himself; (2) that the defendant discovered or, by the exercise of reasonable precaution, should have discovered such peril; and (3) that, at such time, the defendant could, with the exercise of reasonable care, have avoided the accident. Jones v. Firemen's Insurance Co. of Newark, N.J., La.App., 240 So.2d 780; 256 La. 1143, 241 So.2d 250.

I do not find that plaintiff Leake was in a position of peril of which he was unaware. He was thoroughly aware of the dangerous nature of gasoline and the complications connected with its delivery. His plant manager Watson was also cognizant of the perils which could ensue from the negligent delivery of gasoline. The plant manager abandoned the bulk plant at a time when he should have been present; the peril which ensued during his absence was not of such a nature that Watson and Leake were unaware of it or were unable to extricate themselves from it. I do not mean to say

that fire accompanied by destruction might not have occurred had Watson been present, but I do find that under the instant facts and circumstances the peril was not that contemplated by the doctrine of last clear chance. I say that had Watson been present during delivery, he might have been able to lessen the severity of the loss suffered. Bertinot discovered the peril, but the facts show that the time of discovery was late; the record does not show that Bertinot should reasonably have discovered the peril sooner; the facts do not show that at the time of discovered peril, Bertinot could have avoided the explosion and fire. The facts disclose negligent conduct, but they are not conclusive that the instant peril could have been avoided. Therefore, under the facts and circumstances of this case, the doctrine of last clear chance, in my opinion, does not apply to Bertinot.

It is my opinion that James R. Leake, Sr. and Robert M. Watson were negligent.

Robert M. Watson stated that he had worked continuously for Mr. Leake since the Spring of 1946 when he returned from the Service, and that he had been bulk plant manager for some ten or twelve years.[1] He said that his duties entailed all of the work of the bulk plant, including the distribution of gasoline to the filling stations

which purchased gasoline from Mr. Leake. He lived less than a half mile from the plant, and on the morning of February 13, 1968, he received a call from Bertinot at approximately 6:10 A.M., informing him that he was in St. Francisville with the load of premium gasoline which had been previously ordered. Watson arrived at the plant within ten minutes of the call; the weather was 33° and cold, but Watson in his hurry had not worn a coat. (Watson ordinarily arrived at the plant around 7:00 A.M.; the driver knew that if he called Watson, he could get an earlier start in unloading.) When asked what he did when he arrived at the bulk plant, Watson said, "The truck was spotted in position to unload and I opened the door—unlocked the door and opened my valve inside and started to help hook up the hose and about that time I got pretty cool and I asked Robert to get his papers and I signed them for him and I left." Watson said that he hooked up the discharge hose to his receiving line, but that he did not hook up any part of the discharge hose to the truck. When he left the plant, Bertinot had not started pumping gasoline, and he thought that Bertinot would have had to open the quick acting valve on the bulk plant. He did not tell Bertinot how much gas was in the premium tank, or that in all probability he had more gas than the

---

1. In giving his deposition, Mr. Leake said that he had known Watson since he was about five years old. He said that Watson was the man he wanted in particular because he had absolute integrity and was different from so many others. He was not afraid of work.

tank would hold. With respect to the receipt of gasoline, Watson testified:

"Q. Now let me ask you this—was there anyone other than yourself who received gas from the trucks as a general proposition?

"A. I think I took care of the bulk of that—I would leave the door unlocked or either they'd call me when they'd come in early in the morning and I'd go down and open up so they could unload.

" * * *

"Q. Did you have any regulation that required that you or some representative of Mr. Leake stay at the plant while the gas was being unloaded?

"A. No sir.

"Q. Now I believe you testified that on this morning you went down to the plant and opened the plant yourself?

"A. Yes sir.

"Q. Were there ever any occasions when you did not go to the plant itself when deliveries were made?

"A. Quite often I would load the truck and leave in the mornings before the load of gas arrived and I would leave the door unlocked so he could pump out and wouldn't have to wait on me.

"Q. And in those instances who was the one that was required to handle the valves?

"A. The driver of the transport.

"Q. Do you know whether or not Mr. Bertinot has ever done this before himself?

"A. Yes sir."[2]

Watson said that four hundred gallons more than the premium tank capacity were ordered through error; that during the period of time he had been working for

2. In his deposition, Mr. Leake gave the following testimony:
"Q. Would he ordinarily stay around when they were unloading?
"A. Not all the time, no, sir.
"Q. Who would turn off your valves, either your quick action valve or the screw type?
"A. Prudhomme's driver would.
"Q. When he finished?
"A. We had an agreement with them to keep from tying their truck up, you know, making them sit there and waiting.
" * * *
"Q. Now, I believe you say that you had an agreement with the company whereby Watson would—well, I guess we'd say anticipatorily signed the delivery receipt—
"A. That's right.—before the gas was actually delivered? And I—
We—we cooperated with Prudhomme, and they cooperated with us. I mean we didn't want to tie their trucks up and keep them sitting there. And so often we'd leave the door unlocked and let your man just come on and hook up and pump and get going. I mean, we—
"Q. Well, that benefited you mutually, didn't it?
"A. That's right. I mean—
"Q. That let Watson get going, too, didn't it?
"A. Exactly right."

Mr. Leake, tanks had overflowed approximately a half dozen times and no fire had resulted. When there was an overflow, the gasoline would spew out of the tank, "and they'd shut down the pumping operation and I would have to load the balance of the gas or fuel that was left in the transport in my delivery truck so he could complete his unloading operation." He testified further:

"Q. Did you tell Robert Bertinot that in all probability he had more gas than that tank would hold and that there would be an overflow?

"A. No sir.

"Q. Did you have your delivery truck available where you could put the excess gas in it if it was necessary to put it in there?

"A. I went to the bulk plant that morning in my car.

"Q. And where was the delivery truck?

"A. It was parked in my yard."

A reading of the testimony of Mr. Leake and Robert M. Watson discloses that Mr. Leake thoroughly approved Watson's leaving the bulk plant before a delivery of gasoline was completed, and that there were many occasions when Watson had not remained at the plant for the completion of deliveries. Leake had an agreement with his supplier for such an arrangement, but the record contains no written document absolving Leake of responsibility. The testimony of record convinces me that the delivery procedure was a dangerous one involving volatile substances or explosives. Such had to be done with the utmost precision, care, and attentiveness. The testimony and deposition of Mr. Leake reveal that he was aware of the fact that an explosion was dangerous to surrounding property and those who occupied it. Watson's testimony discloses that he knew how to take care of an overload delivery, but that he had not taken precautions for Bertinot. I do not find that Bertinot was given control of the bulk plant; I do not find that he was put in charge of it. He was merely left at the plant to take care of a delivery—a physical and technical responsibility. Therefore, under the facts and circumstances of this case, I find that both Mr. Leake and Watson were guilty of negligence; Watson abandoned the bulk plant, with Leake's prior consent, when he should have been present to attend to receipt of his order. The fact that deliveries had been made in the past when the bulk plant was unattended does not absolve Leake and Watson of negligence. One may commit a dangerous and risky act many times before suffering accident or disaster; negligence, however, is never obliterated.

Both the Court of Appeal and this Court on original hearing found that Leake ordered more premium gasoline than the premium tank could hold at the time of

delivery—February 13, 1968; this fact, they found constituted negligence on the part of Mr. Leake. It is certainly a factor to be considered; however, on this rehearing, I do not find it necessary to extend discussion of Leake's order because of my finding that Leake and Watson were both guilty of negligence when Watson abandoned the bulk plant on the morning of February 13, 1968. Plaintiffs are therefore precluded from recovering damages—Mr. Leake because of his own negligence, and Hanover Insurance Company because of the negligence of its insured.

For the above reasons, I respectfully dissent from that part of the majority opinion which allows recovery of damages by plaintiffs.

## ON REHEARING

DIXON, Justice (dissenting).

I respectfully dissent from that portion of the opinion which finds the doctrine of last clear chance applicable.

In my opinion, gasoline is such an extremely dangerous substance that the highest degree of care should be exercised by all persons who are required to handle it. A proper disposition of this case would be to allow each party to bear his own loss.

The reason the doctrine of last clear chance should not benefit the plant operator is that he should have foreseen the same things that the driver should have foreseen;

he should have observed the tank overflowing. At no time was he prevented from making the observation, except for the voluntary absence of the plant employee.

The doctrine of last clear chance is designed, it is true, as a humanitarian doctrine; its object is to prevent wanton injury to persons who are found in a position of peril, and who cannot extricate themselves. The plant operator should not have been unaware of the danger involved; there was never any reason why he could not have "extricated" the plant from destruction by observing that which he could have seen.